# United States Court of Appeals for the District of Columbia Circuit

## No. 24-7021

RUBY FREEMAN; WANDREA' MOSS,

*Plaintiffs-Appellees,*

*v.*

RUDOLPH W. GIULIANI,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of Columbia in Case No. 1:21-cv-03354-BAH*

# PROOF BRIEF FOR DEFENDANT-APPELLANT

KENNETH A. CARUSO
KENNETH CARUSO LAW LLC
15 West 72nd Street
New York, New York 10023
(646) 599-4970
ken.caruso@kennethcarusolaw.com

DAVID LABKOWSKI
LABKOWSKI LAW, P.A.
250 95th Street, Unit 547233
Surfside, Florida 33154
(786) 461-1340
david@labkowskilaw.com

*Counsel for Defendant-Appellant*

October 2, 2024

## APPELLANT'S CERTIFICATE AS
## TO PARTIES, RULINGS, AND RELATED CASES

The undersigned certify that there are no intervenors or amici in this Court and that the parties in this Court are Appellant, Rudolph W. Giuliani, and Appellees Ruby Freeman and Wandrea' Moss. The undersigned further certify that there were no intervenors or amici in the District Court and that, in addition to the foregoing, the following were parties in the District Court:

Herring Networks, Inc., d/b/a One America News Network

Charles Herring

Robert Herring

Chanel Rion

The undersigned further certify that the following were not parties in the District Court, but appeared as petitioners or respondents in relation to third-party discovery proceedings:

Office of the Secretary of State for the State of Georgia

Bernard Kerik

\*      \*      \*

The following rulings will, or may, be involved in this appeal:

1.      Memorandum Opinion; ECF 31 (Oct. 31, 2022) (denying motion to dismiss Amended Complaint) (Howell, J.); *Freeman v. Giuliani*, 2022 WL 16551323 (D.D.C. Oct. 31, 2022).

2.	Memorandum Opinion; ECF 94 (Aug. 30, 2023) (imposing Rule 37 sanctions) (Howell, J.); *Freeman v Giuliani*, 691 F. Supp. 3d 32 (D.D.C. 2023).

3.	Memorandum Opinion and Order; ECF 119 (Dec. 7, 2023) (making various pre-trial rulings) (Howell, J.); *Freeman v Giuliani*, 2023 WL 8472723 (D.D.C. Dec. 7, 2023)

4.	Memorandum Opinion; ECF 159 (April 15, 2024) (denying post-trial motions) (Howell, J.); *Freeman v Giuliani*, 2024 WL 1616675 (D.D.C. Apr. 15, 2024).

\*	\*	\*

The following is a related case as defined by Local Rule 28(a)(1): *Freeman v. Giuliani*, No. 23-cv-3754 (D.D.C.) (judgment entered May 22, 2024).

# TABLE OF CONTENTS

**Page**

APPELLANT'S CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES ........................................................................... i

TABLE OF AUTHORITIES ............................................................ ix

GLOSSARY OF ABBREVIATIONS ................................................ xix

JURISDICTIONAL STATEMENT ..................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................ 1

STATEMENT OF THE CASE ............................................................ 3

SUMMARY OF ARGUMENT ............................................................ 5

    SUMMARY POINT I

    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM ................. 5

    A.    Default Judgment ................................................................... 5

    B.    Standard Of Review ............................................................... 5

    C.    The Amended Complaint Does Not Adequately Allege
        Defendant's Actual Malice ..................................................... 5

        1.    Defamation: Elements ................................................... 5

        2.    Actual Malice ................................................................. 5

        3.    Plaintiffs Did Not Clearly And Convincingly Establish
            Actual Malice ................................................................. 6

            a.    Defendant Made A Rational Interpretation Of
                Ambiguous Information ....................................... 6

            b.    Plaintiffs' Allegations Do Not Establish Actual
                Malice .................................................................. 6

    D.    The Amended Complaint Does Not Adequately Allege
        Liability On A Civil-Conspiracy Theory ............................... 9

        1.    Applicable Law .............................................................. 9

2. The Amended Complaint Does Not Adequately Allege That A Coconspirator Committed Defamation..........................9

    a. Trump-Raffensperger Phone Call......................................9

    b. Unidentified Coconspirators...........................................10

E. The IIED Claims Fail ...........................................................10

F. Plaintiffs Cannot Recover For Defamation And IIED........................10

G. The Amended Complaint Does Not Adequately Allege "Extreme And Outrageous Conduct".................................10

SUMMARY POINT II

PLAINTIFFS DID NOT ESTABLISH PROXIMATE CAUSE .................11

A. The Compensatory Awards Fall.........................................................11

1. Default Judgment ...............................................................11

2. Proximate Cause: Intervening Criminal Acts ...........................11

3. The Amended Complaint Does Not Adequately Allege Proximate Cause ...................................11

4. The Evidence Of Proximate Cause Was Insufficient ...............12

B. The Punitive Award Falls.....................................................12

SUMMARY POINT III

PLAINTIFFS CANNOT RECOVER PUNITIVE DAMAGES ...................12

A. Dual-Malice Requirement ...................................................12

B. Common-Law Malice ...........................................................13

C. The Amended Complaint Does Not Adequately Allege Common-Law Malice ...................................13

D. The Evidence Of Common-Law Malice Was Insufficient ................13

E. The Court Failed To Instruct On Common-Law Malice ....................13

SUMMARY POINT IV

THE DISTRICT COURT ERRED WHEN IT ADDED TO THE TRIAL EVIDENCE.........................................................15

A.   Applicable Law ...................................................................15

B.   Court Erred .......................................................................15

C.   The Error Was Not Harmless ...........................................16

D.   The Cumulative Effect Of Additional Errors Warrants
     Reversal ...........................................................................16

SUMMARY POINT V

THE VERDICTS ARE EXCESSIVE ............................................19

A.   The Court Should Review These Issues.............................19

B.   The Compensatory Damages Are Excessive ......................19

C.   Common Law: The Punitive Damages Are Excessive .......19

D.   Constitutional Law: The Punitive Damages Are Grossly
     Excessive ..........................................................................19

     1.   Lack Of Legitimate State Interest ............................20

     2.   The *Gore* Guideposts ............................................20

          a.   Reprehensibility.............................................20

          b.   Disparity Between Compensatory And Punitive
               Awards .........................................................21

          c.   Sanctions For Comparable Misconduct...........21

ARGUMENT ..............................................................................22

POINT I

THE AMENDED COMPLAINT FAILS TO STATE A CLAIM
UPON WHICH RELIEF CAN BE GRANTED ............................22

A.   Default Judgment: Legal Effects.......................................22

B.   Standard Of Review ..........................................................23

C.   The Amended Complaint Does Not Adequately Allege
     Defendant's Actual Malice.................................................23

     1.   Defamation: Essential Elements ..............................23

     2.   Actual Malice: Applicable Law ................................24

3.     Plaintiffs Did Not Clearly And Convincingly Establish Actual Malice ......................................................................24

      a.     Defendant Made A Rational Interpretation Of Ambiguous Information ..................................................25

      b.     Plaintiffs' Allegations Do Not Establish Actual Malice ......................................................................27

D.     The Amended Complaint Does Not Adequately Allege Liability On A Civil-Conspiracy Theory ............................................32

     1.     Conspiracy: Applicable Law......................................................32

     2.     The Amended Complaint Does Not Adequately Allege That A Coconspirator Committed Defamation.........................34

      a.     Trump-Raffensperger Phone Call....................................34

      b.     Unidentified Coconspirators...........................................35

E.     The IIED Claims Fail .......................................................................36

F.     Plaintiffs Cannot Recover For Both Defamation And IIED..............36

G.     The Amended Complaint Does Not Adequately Allege "Extreme And Outrageous Conduct"...................................................37

POINT II

PLAINTIFFS DID NOT ESTABLISH PROXIMATE CAUSE ..................39

A.     The Compensatory Awards Fall For Lack Of Proximate Cause ................................................................................................39

     1.     Proximate Cause: Legal Effect Of Default Judgment ..............39

     2.     Proximate Cause: Intervening Criminal Acts ..........................40

     3.     The Amended Complaint Does Not Adequately Allege Proximate Cause .....................................................................41

     4.     The Trial Evidence Of Proximate Cause Was Insufficient To Sustain The Verdicts ........................................42

B.     The Punitive Award Falls With The Compensatory Awards .............43

POINT III

PLAINTIFFS CANNOT RECOVER PUNITIVE DAMAGES ...................43

A.      Applicable Law: The Dual Malice Requirement ................................43

B.      Applicable Law: Common-Law Malice ................................................44

C.      The Amended Complaint Does Not Adequately Allege Common-Law Malice ................................................................45

D.      The Trial Evidence Of Common-Law Malice Was Insufficient To Sustain The Verdict ................................................46

E.      The District Court Failed To Instruct The Jury On Common-Law Malice ................................................................46

POINT IV

THE DISTRICT COURT ERRED WHEN IT ADDED TO THE TRIAL EVIDENCE ................................................................50

A.      Applicable Law ................................................................51

B.      The District Court Erred ................................................52

C.      The Error Was Not Harmless ................................................54

D.      The Cumulative Effect Of Additional Errors Warrants Reversal ................................................................56

POINT V

THE VERDICTS ARE EXCESSIVE ................................................................63

A.      The Court Should Review These Issues ................................................63

B.      The Compensatory Damages Are Excessive ................................................64

C.      Common Law: The Punitive Damages Are Excessive ................................65

D.      Constitutional Law: The Punitive Damages Are Grossly Excessive ................................................................66

      1.      The Court Should Reverse For Lack Of Legitimate State Interest ................................................................67

      2.      The Court Should Reverse On Examination Of The *Gore* Guideposts ................................................69

            a.      Degree Of Reprehensibility ................................69

            b.      Disparity Between The Compensatory And The Punitive Awards ................................................70

        c.     Sanctions Authorized For Comparable
               Misconduct .......................................................................71

CONCLUSION ..........................................................................................73

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Afro-American Pub. Co. v. Jaffe*,
  366 F.2d 649 (D.C. Cir. 1966)..............................................................46, 47

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...........................................................................14, 49

*Ayala v. Washington*,
  679 A.2d 1057 (D.C. 1996) .......................................................................43

*Barr v. Matteo*,
  360 U.S. 564 (1959)...................................................................................34

*Batka v. Liberty Mutual Fire Ins. Co.*,
  704 F.2d 684 (3d Cir. 1983) ................................................................14, 48

*Bearchild v. Cobban,*
  947 F.3d 1130 (9th Cir. 2020) ..................................................................49

*Blankenship v. NBCUniversal, LLC,*
  60 F.4th 744 (4th Cir. 2023) .....................................................................36

*Blunt v. United States*,
  244 F.2d 355 (D.C. Cir. 1957)...................................................................52

*BMW of North America, Inc. v. Gore*,
  517 U.S. 559 (1996)..............................................19, 20, 66, 67, 68, 69, 71

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984).......................................................................6, 23, 25

*Bourjaily v. United States*,
  483 U.S. 171 (1987)...................................................................................55

*Bowles v. United States*,
  439 F.2d 536 (D.C. Cir. 1970)........................................................17, 58, 60

*Byrd v. United States*,
  342 F.2d 939 (D.C. Cir. 1965)...................................................................49

*Campbell-Crane & Assoc., Inc. v. Stamenkovic*,
  44 A.3d 924 (D.C. 2012) ...........................................................................64

ix

*Cannon v. Peck*,
    36 F.4th 547 (4th Cir. 2022) ........................................................35

*Cerro Gordo Charity v. Fireman's Fund American Life Ins. Co.*,
    819 F.2d 1471 (8th Cir. 1987) ..................................................57

*Columbia First Bank v. Ferguson*,
    665 A.2d 650 (D.C. 1995) ........................................................44

*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*,
    532 U.S. 424 (2001)..................................................... 49, 63, 67

*Coquina v. TD Bank, N.A.*,
    760 F.3d 1300 (11th Cir. 2014) ...............................................57

*Couch v. Verizon Communications, Inc.*,
    105 F.4th 425 (D.C. Cir. 2024), *aff'g*, 2021 WL 4476698
    (D.D.C. Sept. 30, 2021) ................................................ 24, 36, 37

*Cunningham v. United States*,
    311 F.2d 772 (D.C. Cir. 1962)..................................................56

*Czekalski v. LaHood*,
    589 F.3d 449 (D.C. Cir. 2009)..................................................47

*Daka, Inc. v. Breiner*,
    711 A.2d 86 (D.C. 1998) ..........................................................65

*Daka, Inc. v. McCrae*,
    839 A.2d 682 (D.C. 2003) ........................................................65

*Daskalea v. District of Columbia*,
    227 F.3d 433 (D.C. Cir. 2000).......................................... 54, 64

*Delli Paoli v. United States*,
    352 U.S. 232 (1957)..................................................................50

*District of Columbia v. Bamidele*,
    103 A.3d 516 (D.C. 2014) ................................................ 64, 65

*District of Columbia v. Tulin*,
    994 A.2d 788 (D.C. 2010) ........................................................64

*Dongguk University v. Yale University*,
    734 F.3d 113 (2d Cir. 2013) .....................................................36

*Douglas v. Alabama*,
    380 U.S. 415 (1965)..................................................................60

*Dowell, Inc. v. Jowers*,
    166 F.2d 214 (5th Cir. 1948) .....................................................71

*Estate of Schwartz v. Philip Morris Inc.*,
    135 P.3d 409 (Or. App. 2006) ...................................................68

*Ford Motor Co. v. Ammerman*,
    705 N.E.2d 539 (Ind. App. 1999)..............................................68

*Freedom Newspapers of Texas v. Cantu*,
    168 S.W.3d 847 (Tex. 2005) .....................................................27

*Freyberg v. DCO 2400 14th Street*, LLC,
    304 A.3d 971 (D.C. 2023) ....................................... 40, 41, 42, 43

*Funari v. MD Dep't of Public Safety & Correctional Services*,
    2024 WL 2749694 (D. Md. May 29, 2024) ................................64

*Glasser v. United States*,
    315 U.S. 60 (1942)....................................................................52

*Godfrey v. United States*,
    353 F.2d 456 (D.C. Cir. 1965)..................................................56

*Gordon v. Rice*,
    261 A.3d 224 (D.C. 2021) .........................................................72

*Guaranty Trust Co. of N.Y. v. York*,
    326 U.S. 99 (1945)....................................................................67

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983)............................................ 33, 67

*Harte-Hanks Communications, Inc. v. Connaughton*,
    491 U.S. 657 (1989)..................................................................24

*Harvey-Jones v. Coronel*,
    196 A.3d 36 (Md. App. 2018) ...................................................65

*Henry v. Oluwole*,
    108 F.4th 45 (2d Cir. 2024) ......................................................22

*Hinojosa v. Butler*,
    547 F.3d 285 (5th Cir. 2008) .....................................................60

*Homan v. Goyal*,
    711 A.2d 812 (D.C. 1998) ..................................................... 38, 64

*Honda Motor Co. v. Oberg*,
    512 U.S. 415 (1994) ...................................................................66

*Howard University v. Wilkins*,
    22 A.3d 774 (D.C. 2011) ...........................................................65

*Hundley v. District of Columbia*,
    494 F.3d 1097 (D.C. Cir. 2007) .................................................40

*Hurley v. Atlantic City Police Dep't*,
    174 F.3d 95 (3d Cir. 1999) .........................................................49

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) .....................................................................36

*In re Urethane Antitrust Litigation*,
    2013 WL 100250 (D. Kan. Jan. 8, 2013) ...................................59

*Iron Vine Security, LLC v. Cygnacom Solutions, Inc.*,
    274 A.3d 328 (D.C. 2022) .........................................................33

*Jackson v. United States*,
    348 F.2d 772 (D.C. Cir. 1965) ...................................................49

*Jankovic v. Intl. Crisis Group*,
    822 F.3d 576 (D.C. Cir. 2016) .............................................. 28, 32

*Jonathan Woodner Co. v. Breeden*,
    665 A.2d 929 (D.C. 1995) ...................................... 44, 45, 47, 65

*Jones v. Benefit Trust Life Ins. Co.*,
    800 F.2d 1397 (5th Cir. 1986) ...................................................54

*Lacy v. District of Columbia*,
    424 A.2d 317 (D.C. 1980) .........................................................39

*Lesesne v. Doe*,
    712 F.3d 584 (D.C. Cir. 2013) ...................................................64

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
    838 F.2d 1287 (D.C. Cir. 1988) .................................................30

*LiButti v. United States*,
    107 F.3d 110 (2d Cir. 1997) .......................................................57

*Lohrenz v. Donnelly*,
   350 F.3d 1272 (D.C. Cir. 2003) ............................................................ 28, 31

*Lompe v. Sunridge Partners, LLC*,
   818 F.3d 1041 (10th Cir. 2016) ....................................................................70

*MacEdward v. Northern Electric Co. Ltd.*,
   595 F.2d 105 (2d Cir. 1979) ........................................................................49

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991) ....................................................................................25

*McFarlane v. Esquire Magazine*,
   74 F.3d 1296 (D.C. Cir. 1996) ....................................................................32

*McFarlane v. Sheridan Square Press, Inc.*,
   91 F.3d 1501 (D.C. Cir. 1996) ............................................................. 28, 30

*McMurray v. Howard Publications, Inc.*,
   612 P.2d 14 (Wyo. 1980) .............................................................................27

*Michelson v. United States*,
   335 U.S. 469 (1948) ....................................................................................56

*Milone v. Washington M.A.T.A.*,
   91 F.3d 229 (D.C. Cir. 1996) ................................................................ 42, 46

*Modern Management Co. v. Wilson*,
   997 A.2d 37 (D.C. 2010) ....................................................................... 65, 67

*Moldea v. New York Times Co.*,
   15 F.3d 1137 (D.C. Cir. 1994) .............................................................. 36, 37

*Moldea v. New York Times Co.*,
   22 F.3d 310 (D.C. Cir. 1994) ......................................................................25

*Molina-Martinez v. United States*,
   578 U.S. 190 (2016) .............................................................................. 47, 48

*Morrissey v. Mayorkas*,
   17 F.4th 1150 (D.C. Cir. 2021) ...................................................................58

*Nader v. de Toledano*,
   408 A.2d 31 (D.C. 1979) ...................................................................12, 44, 48

*Nader v. Democratic Nat. Committee*,
   567 F.3d 692 (D.C. Cir. 2009) .............................................................. 32, 33

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964)......................................................... 24, 35, 72

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982).................................................................34

*Ofisi v. BNP Paribas, S.A.,*
    77 F.4th 667 (D.C. Cir. 2023)..................................................33

*Olano v. United States,*
    507 U.S. 725 (1993).................................................................47

*Oparaugo v. Watts,*
    884 A.2d 63 (D.C. 2005) ..........................................................23

*Ortberg v. Goldman Sachs Group,*
    64 A.3d 158 (D.C. 2013) ..........................................................38

*Owens v. Republic of Sudan,*
    864 F.3d 751 (D.C. Cir. 2017).............................................. 63, 64

*Palmore v. United States,*
    411 U.S. 389 (1973).................................................................67

*Parker v. Scrap Metal Processors, Inc.,*
    386 F.3d 993 (11th Cir. 2004) ..................................................50

*Philip Morris USA v. Williams,*
    549 U.S. 346 (2007).................................................................67

*Pitt v. District of Columbia,*
    491 F.3d 494 (D.C. Cir. 2007)...................................................44

*Plante v. Long,*
    170 A.3d 243 (Me. 2017) .................................................... 26-27

*Quercia v. United States,*
    289 U.S. 466 (1933)......................................................... 15, 51, 55

*Rasanen v. Doe,*
    723 F.3d 325 (2d Cir. 2013) .....................................................49

*Robinson v. Sarisky,*
    535 A.2d 901 (D.C. 1988) .........................................................64

*Salem Media Group, Inc. v. Awan,*
    301 A.3d 633 (D.C. 2023) ................................................. 37, 38, 39

*Scott v. Crestar Financial Corp.*,
    928 A.2d 680 (D.C. 2007) ................................................................ 64, 65

*Septimus v. University of Houston*,
    399 F.3d 601 (5th Cir. 2005) ............................................................. 49

*Sigmund v. Starwood Urban Retail VI, LLC*,
    617 F.3d 512 (D.C. Cir. 2010) ......................................................... 42, 43

*Smith v. Clinton*,
    886 F.3d 122 (D.C. Cir. 2018) ......................................................... 33

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ................................................................. 10, 38, 70

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) .......................................................................... 24

*Standley v. Edmonds-Leach*,
    783 F.3d 1276 (D.C. Cir. 2015) ...................................................... 62

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) .......................................................... 20, 67, 70, 71

*Teltschik v. Williams & Jensen, PLLC*,
    748 F.3d 1285 (D.C. Cir. 2014) ...................................................... 36-37

*Time, Inc. v. Pape*,
    401 U.S. 279 (1971) ........................................................................ 6, 26

*Tompkins v. Cyr*,
    995 F. Supp. 664 (N.D. Tex. 1998) ................................................ 37

*Trump v. United States*,
    144 S. Ct. 2312 (2024) ..................................................................... 34

*Underwager v. Salter*,
    22 F.3d 730 (7th Cir. 1994) ............................................................. 32

*United States v. Abel*,
    469 U.S. 45 (1984) .......................................................................... 28-29

*United States v. Aitkin*,
    755 F.2d 188 (1st Cir. 1985) ........................................................... 49

*United States v. Alston*,
    551 F.2d 315 (D.C. Cir. 1976) ......................................................... 49

*United States v. Andasola*,
    13 F.4th 1011 (10th Cir. 2021) .............................................................. 15, 51

*United States v. Blanchard*,
    542 F.3d 1133 (7th Cir. 2008) ......................................................................51

*United States v. Kline*,
    922 F.2d 610 (10th Cir. 1990) .....................................................................49

*United States v. Lopez-Soto*,
    960 F.3d 1 (1st Cir. 2020) ............................................................................52

*United States v. Maloney*,
    262 F.2d 535 (2d Cir. 1959) ................................................................... 58, 60

*United States v. McGill*,
    815 F.3d 846 (D.C. Cir. 2016) .....................................................................56

*United States v. Miller*,
    738 F.3d 361 (D.C. Cir. 2013) .....................................................................52

*United States v. Monzel*,
    641 F.3d 528 (D.C. Cir. 2011) .....................................................................39

*United States v. Nickl*,
    427 F.3d 1286 (10th Cir. 2007) ............................................................. 51, 54

*United States v. Paiva*,
    892 F.2d 148 (1st Cir. 1989) ........................................................................52

*United States v. Pritchett*,
    699 F.2d 317 (6th Cir. 1983) ................................................................. 51, 56

*United States v. Rawlings*,
    73 F.3d 1145 (D.C. Cir. 1996) .....................................................................49

*United States v. Rhone*,
    864 F.2d 832 (D.C. Cir. 1989) .....................................................................71

*United States v. Robertson*,
    103 F.4th 1 (D.C. Cir. 2023) ........................................................................46

*United States v. Science Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010) ...................................................................54

*United States v. Tracy*,
    12 F.3d 1186 (2d Cir. 1993) .........................................................................55

*United States v. Uvino*,
  590 F. Supp. 2d 372 (E.D.N.Y. 2008) ...........................................58

*United States v. Valentine*,
  70 F. App'x 314 (6th Cir. 2003) ....................................................52

*United States v. Wharton*,
  433 F.2d 451 (D.C. Cir. 1970) .......................................................49

*United States v. Wyatt*,
  442 F.2d 858 (D.C. Cir. 1971) .......................................................56

*Veg-Mix, Inc. v. Dep't of Agriculture*,
  832 F.2d 601 (D.C. Cir. 1987) .......................................................65

*White v. Ford Motor Co.*,
  312 F.3d 998 (9th Cir. 2002) .........................................................68

**Statutes & Other Authorities:**

U.S. Const., Amend. I ............................................................... 25, 30, 38

U.S. Const., Amend. V ........................................................... 58, 59, 60, 67

U.S. Const., Amend. XIV .................................................................67

18 U.S.C. § 3553(a) ............................................................................65

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1332(a)(1) ..........................................................................1

28 U.S.C. § 2111 ................................................................................54

1 Standard Civil Jury Instructions § 17.14 (2024) ........................ 44, 47

4 Sand, Modern Federal Jury Instructions—Civil (2024) .....................62

10A Wright & Miller, Federal Practice & Procedure § 2688.1 (4th ed.
  2024) .................................................................................... 22, 40

D.C. Code § 22-3132(8)(A) ................................................................72

D.C. Code § 22-3133 ..........................................................................72

D.C. Code § 22-3134(b)(4) .................................................................72

D.C. Code § 22-3571.01(b)(6) ............................................................72

D.C. Code § 22-3571.01(b)(12) ................................................................72

Fed. R. Evid. 401 ........................................................................ 16, 54, 57

Fed. R. Evid. 605 ..................................... 3, 15, 16, 50, 51, 54, 56

Fed. R. Evid. 801(d)(2)(E) ............................................................55

Georgia Code § 16-4-1 ...................................................................41

Georgia Code § 16-7-5 ...................................................................41

Georgia Code § 16-11-39.1 .............................................................41

Georgia Code § 51-12-5.1(f) ...........................................................72

Georgia Code § 51-12-5.1(g) ..........................................................68

Prosser, Torts § 1 (5th ed. 1984) ....................................................61

Prosser, Torts § 2 (5th ed. 1984) ....................................................43

Prosser, Torts § 46 (5th ed. 1984) ..................................................33

Restatement (Third), Law Governing Lawyers § 16(3) ................35

Sack, Defamation § 2.8:1 (2024) ....................................................61

Sack, Defamation § 5:5.1(A) (2024) ...............................................43

Sack, Defamation § 10:3.5 (2024) ..................................................69

# GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| "Plaintiffs" | Ruby Freeman and Wandrea' Moss |
| "Defendant" | Rudolph W. Giuliani |
| "Video" | A video from a State Farm Arena security camera, PTX-251 |
| "AC" | Plaintiffs' Amended Complaint |
| "Judgment" | The Final Judgment entered by Judge Howell, ECF 142 |
| "WRIGHT & MILLER" | Wright & Miller, Federal Practice & Procedure (4th ed. 2023) |
| "PROSSER" | Prosser, Torts (5th ed. 1984) |
| "SACK" | Sack, Defamation (2024) |
| "Standard Instructions" | Standardized Civil Jury Instructions for the District of Columbia (2024) |

Rudolph W. Giuliani ("Defendant") appeals from a judgment of the United States District Court for the District of Columbia, Hon. Beryl A. Howell, United States District Judge, awarding damages in favor of Plaintiffs Ruby Freeman and Wandrea' Moss ("Plaintiffs").

## JURISDICTIONAL STATEMENT

The district court had diversity-of-citizenship jurisdiction under 28 U.S.C. §1332(a)(1). Plaintiffs were citizens of Georgia; Defendant was a citizen of New York.

This Court has jurisdiction under 28 U.S.C. §1291. Defendant appeals from a final decision, which disposes of all parties' claims.

The district court entered judgment on December 18, 2023. Defendant filed a bankruptcy petition on December 21, 2024, which stayed proceedings in the district court. The bankruptcy court lifted the stay, and Defendant filed a timely notice of appeal, on February 20, 2024.

## ISSUES PRESENTED
## FOR REVIEW

I.      Does the Amended Complaint state a claim upon which relief can be granted? Specifically:

A.      Does the Amended Complaint adequately allege that Defendant published with "constitutional malice," also known as "actual malice?"

B.     Does the Amended Complaint adequately allege liability on a civil-conspiracy theory?

C.     In the alternative, can Plaintiffs recover for both defamation and intentional infliction of emotional distress ("IIED") where, as here, Plaintiffs base both claims on the same publications?

D.     In the further alternative, with respect to IIED, does the Amended Complaint adequately allege "extreme and outrageous conduct" where, as here, Defendant engaged in pure speech, regarding a matter of legitimate public interest?

II.     As to compensatory damages:

A.     Does the Amended Complaint adequately allege proximate cause?

B.     In the alternative, did the trial evidence provide a legally sufficient basis for a reasonable jury to find for Plaintiffs on proximate cause?

III.     As to punitive damages, did Plaintiffs establish "common-law malice," as required for such an award?  Specifically:

A.     Does the Amended Complaint adequately allege common-law malice?

B.     In the alternative, did the trial evidence provide a legally sufficient basis for a reasonable jury to find for Plaintiffs on common-law malice?

C.     In the further alternative, did the district court commit plain error when it failed to instruct the jury on common-law malice?

IV.     Did the district court add to the evidence, in violation of Fed. R. Evid. 605?

V.     Are the verdicts excessive?  Specifically:

A.     Is the compensatory-damages award excessive?

B.     Is the punitive-damages award excessive as a matter of common law?

C.     In the alternative, is the punitive-damages award "grossly excessive" as a matter of constitutional due process?

## STATEMENT OF THE CASE

Plaintiffs, during the Presidential election in 2020, were employed by Fulton County, Georgia, to process absentee ballots at State Farm Arena.  Security cameras videotaped their work.

After the election, "the Trump campaign published an excerpted clip from State Farm Arena security[-]camera video[]" PTX-251 (the "Video").  Amended Complaint ("AC") ¶40.  Defendant, the head of the Trump legal team, viewed the Video.  Defendant thereafter published a series of statements in which Defendant described and interpreted what he saw.  According to Plaintiffs, Defendant published:

statements that assert and/or imply that, among other
things, (i) [Plaintiffs] engaged in a criminal conspiracy,
along with others, to illegally exclude observers during
the counting of ballots 'under false pretenses' so that they
could engage in election fraud; (ii) [Plaintiffs] criminally
and/or fraudulently introduced 'suitcases' of illegal
ballots into the ballot-counting process; (iii) [Plaintiffs]
fraudulently counted the same ballots multiple times; (iv)
[Plaintiffs] were involved in surreptitiously passing
around flash drives that were not supposed to be placed
in Dominion voting machines; and (v) that [Plaintiffs]
committed crimes and other fraud.

AC¶134.

Others republished Defendant's statements. For example, then-President
Trump repeated some of those statements in a telephone call with Georgia's
Secretary of State. A recording and a transcript of that call circulated widely.

Plaintiffs later commenced this action. Each Plaintiff asserted claims for
defamation and for IIED.

The district court denied Defendant's motion to dismiss the Amended
Complaint. Later, however, Defendant failed to satisfy discovery obligations,
whereupon the court entered a default judgment against Defendant on issues of
liability. ECF-94-95.

The court then conducted a five-day trial on damages, after which a jury
returned verdicts in Plaintiffs' favor, awarding approximately $73,000,000 in
compensatory damages, and $75,000,000 in punitive damages. ECF-135. The

court entered Final Judgment on the verdicts (the "Judgment") for approximately

$146 million.  ECF-142.

## SUMMARY OF ARGUMENT

## SUMMARY POINT I

## THE AMENDED COMPLAINT
## FAILS TO STATE A CLAIM

### A.    Default Judgment

A defaulting defendant admits facts alleged in the complaint, but not

conclusions of law.

### B.    Standard Of Review

This Court has an obligation to make an independent examination of the

whole record in order to make sure that the judgment does not constitute a

forbidden intrusion on the field of free expression.

### C.    The Amended Complaint Does Not
### Adequately Allege Defendant's Actual Malice

#### 1.    Defamation: Elements

The Amended Complaint does not adequately allege that Defendant

published with constitutional/actual malice.  Defendant, by the default judgment,

does not admit the legal conclusion that he published with actual malice.

#### 2.    Actual Malice

A plaintiff must establish that the defendant published with knowledge of

falsity or with reckless disregard.  To establish reckless disregard, the plaintiff

must prove that the defendant published despite entertaining serious doubts as to the truth of his publication. Actual malice requires clear and convincing evidence.

### 3. Plaintiffs Did Not Clearly And Convincingly Establish Actual Malice

#### a. Defendant Made A Rational Interpretation Of Ambiguous Information

A plaintiff cannot establish actual malice where a speaker/publisher learns ambiguous information and adopts "one of a number of possible rational interpretations" of that information. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512-13 (1984) (cleaned-up).

Here, Defendant watched the Video, PTX-251, which served as his source of information. Defendant played the Video for his audience, and narrated his rational interpretation of what he saw. He expressed that interpretation as his audience watched: "What you just saw is probably one of the most dramatic examples I've ever seen of someone trying to steal an election[.]" PTX-251 at 18:42-18:55.

At best for Plaintiffs, Defendant's interpretation "arguably reflect[s] a misconception[,]" which cannot "create a jury issue of '[actual] malice[.]'" *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971).

#### b. Plaintiffs' Allegations Do Not Establish Actual Malice

Plaintiffs' allegations do not change the conclusion that Defendant lacked actual malice. According to the Amended Complaint:

Defendant repeated information disclosed by a campaign lawyer in official testimony, subject to penalties for false statement.

Defendant had no obligation to accept denials of misconduct, made by Georgia officials. Such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.

Defendant had no obligation to accept the denials of the *biased* Georgia officials. At the time the officials denied election misconduct, Georgia had already certified the election results in favor of Biden. Georgia officials had an obvious motive to make statements that supported the prior institutional determination that election fraud had not occurred.

A Georgia official described the Video, in part, as a "he said, she said[.]" Such a dispute, by definition, presents facts that point, inconclusively, in two directions. A publisher's choice between two factually-supported versions of "absolute truth" does not demonstrate actual malice.

Plaintiffs contend that Defendant published with actual malice when he stated that workers took "suitcases" containing ballots from under a table. The Georgia official, however, confirmed that as a factual matter. His characterization of the containers as "regular absentee carriers[,]" not "suitcases[,]" is immaterial.

Plaintiffs contend that Defendant published with actual malice when he stated that workers had scanned the same ballots multiple times. Specifically, Plaintiffs rely on an official's answer to a reporter's question, "Can you explain whether the machines can count a ballot three times?" Tellingly, the official did not answer "no." Rather, he said that multiple counting can occur but would be detected after the fact. This confirms that Defendant saw what was—or what could rationally be interpreted as—multiple counting.

The official concluded: "[T]he problem we have is people don't understand this[.]" That conclusion, however, merely disputes Defendant's interpretation of what Defendant saw on the Video. "Misunderstandings" do not show actual malice.

Plaintiffs urge that Defendant had a preconceived political mission. Evidence that a publisher was on a mission to advance a preconceived storyline, however, does not suffice to show actual malice.

Finally, Plaintiffs rely on a document stating, Freeman "now under arrest" and providing evidence "on advanced coordinated effort to commit voter/election fraud [*need confirmation of arrest and evidence*]." A publisher's self-disclosure of a gap in his knowledge, however, tends to rebut a claim of actual malice, not to establish one.

**D.** **The Amended Complaint Does Not Adequately Allege Liability On A Civil-Conspiracy Theory**

**1.** **Applicable Law**

Civil conspiracy is only a means for establishing liability for an underlying tort. A plaintiff must establish that a coconspirator committed the underlying tort—here, defamation, including all its elements, such as unprivileged publication and publication with actual malice.

**2.** **The Amended Complaint Does Not Adequately Allege That A Coconspirator Committed Defamation**

**a.** **Trump-Raffensperger Phone Call**

Plaintiffs seek to hold Defendant liable for statements made by then-President Trump on a call with Georgia Secretary Raffensperger. Trump, however, did not commit defamation.

*First*, the President has absolute immunity from civil liability for official acts and an absolute privilege in a defamation case.

*Second*, Plaintiffs' allegations do not clearly and convincingly establish that Trump spoke with actual malice. Plaintiffs allege that Trump merely re-published statements made to Trump by Defendant. Here, Defendant lacked actual malice. Therefore, Trump lacked actual malice.

Finally, the law allowed Trump to publish information learned from a reliable source—such as his lawyer, Defendant.

### b. Unidentified Coconspirators

The court submitted the case to the jury on the theory that Defendant conspired with unidentified members of the Trump campaign.

Defendant, however, can have liability only if the coconspirators published with actual malice. Here, Plaintiffs cannot possibly establish the states of mind of unidentified persons.

### E. The IIED Claims Fail

The IIED claim fails for lack of actual malice.

### F. Plaintiffs Cannot Recover For Defamation And IIED

Where, as here, the same publications underlie both defamation and IIED, the IIED claims duplicate the defamation claims. Plaintiffs may recover on only one of those theories.

### G. The Amended Complaint Does Not Adequately Allege "Extreme And Outrageous Conduct"

A plaintiff must show extreme and outrageous conduct by the defendant. Outrageous speech, however, is protected by the Constitution.

Here, Defendant spoke regarding a matter of legitimate public interest—a Presidential election. Such speech "is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (cleaned-up).

To be sure, third-persons, who saw or read Defendant's statements, engaged in extreme and outrageous conduct, such as trespass, attempted home invasion, and

calls filled with profanities, racial slurs and threats.  Defendant, however, has no liability where, as here, Plaintiffs do not allege that Defendant coordinated with those third-persons.

## SUMMARY POINT II

## PLAINTIFFS DID NOT
## ESTABLISH PROXIMATE CAUSE

### A.    The Compensatory Awards Fall

### 1.    Default Judgment

Defendant admits cause-in-fact, but not the legal conclusion that the admitted facts constitute proximate cause.

### 2.    Proximate Cause: Intervening Criminal Acts

An intervening criminal act relieves the defendant of liability, unless the plaintiff pleads and proves heightened foreseeability.

### 3.    The Amended Complaint Does Not
### Adequately Allege Proximate Cause

Here, as discussed above, the Amended Complaint repeatedly alleges criminal acts—committed by third-persons—which intervened between Defendant's publications and Plaintiffs' injuries.  D.C. law, therefore, required Plaintiffs to allege heightened foreseeability.  The Amended Complaint, however, makes no such allegations.

To be sure, the Amended Complaint alleges that a Georgia voting employee stated, "Someone's going to get hurt, someone's going to get shot, someone's

going to get killed." AC¶138. That generic statement, however, does not suffice. It fails to state a precise location or class of persons.

### 4. The Evidence Of Proximate Cause Was Insufficient

In the alternative, and for similar reasons, the trial evidence was legally insufficient on the heightened-foreseeability issue.

## B. The Punitive Award Falls

Where the Court reverses the compensatory awards, the Court also reverses the punitive award.

## SUMMARY POINT III

## PLAINTIFFS CANNOT RECOVER PUNITIVE DAMAGES

## A. Dual-Malice Requirement

To recover punitive damages, a plaintiff must plead and prove two different kinds of malice—constitutional malice, also known as "actual malice," and common-law malice.

Constitutional malice focuses on "the defendant's attitude toward the truth or falsity of the content of [his] publication." *Nader v. de Toledano*, 408 A.2d 31, 40 (D.C. 1979). Common-law malice, by contrast, "focus[es] on the defendant's attitude toward the plaintiff as the animus for defamatory publication[.]" *Id*.

Here, however, as demonstrated above, Plaintiffs have not established constitutional malice. Furthermore, as demonstrated below, Plaintiffs have not established common-law malice.

**B.      Common-Law Malice**

A plaintiff must prove—by clear and convincing evidence—that defendant published with spite, ill-will or the like toward the plaintiff.

**C.      The Amended Complaint Does Not
         Adequately Allege Common-Law Malice**

The Amended Complaint does not allege that Defendant published with spite, ill-will or the like toward Plaintiffs. Rather, the Amended Complaint alleges that Defendant published to reap political and financial benefits.

**D.      The Evidence Of Common-Law
         Malice Was Insufficient**

In the alternative, the Court should reverse because the trial-record contains no evidence that Defendant published with spite, or ill-will toward Plaintiffs. As Plaintiff Moss testified, Defendant "didn't know me from a hole in the wall."

**E.      The Court Failed To Instruct
         On Common-Law Malice**

In the further alternative, the Court should reverse because the district court committed plain error by failing to instruct the jury on common-law malice.

*First*, the court erred, failing to instruct on either the substantive law of common-law malice or the clear-and-convincing-evidence standard.

*Second*, the error was obvious: Applicable law is well-settled, appearing in standard jury instructions, and in cases that span more than 150 years.

*Third*, the error affected Defendant's substantial rights. On this issue, the defendant must demonstrate a reasonable probability of a different outcome. Defendant has demonstrated that here.

The jury, left to its own devices, could only speculate on the governing law, whereupon the jury returned a massive verdict. Correct instructions, however, would have focused the jury on the correct issue—Defendant's attitude toward Plaintiffs as the animus for his speech—an issue on which the evidence cut sharply against Plaintiffs.

"It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-55 (1986). Accordingly, "incorrect instruction as to the evidentiary standard of proof is plain error." *Batka v. Liberty Mutual Fire Ins. Co.*, 704 F.2d 684, 690 (3d Cir. 1983).

*Fourth*, the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. The jury imposed a private fine, without knowing—and therefore without applying—the law. Such a verdict undermines the integrity of judicial proceedings.

# SUMMARY POINT IV

## THE DISTRICT COURT
## ERRED WHEN IT ADDED
## TO THE TRIAL EVIDENCE

### A.    Applicable Law

Under Rule 605, "[t]he presiding judge may not testify as a witness at the trial."  The Rule applies to statements from the bench in the presence of the jury.

A "court violates Rule 605 when it adds to the record evidence."  *United States v. Andasola*, 13 F.4th 1011, 1016 (10th Cir. 2021) (cleaned-up).  Under the common-law power to comment on evidence, a judge "may analyze and dissect the evidence, but [s]he may not either distort it or add to it."  *Quercia v. United States*, 289 U.S. 466, 470 (1933).

### B.    Court Erred

Here, the court twice informed the jury that certain matters had already been decided: "[Defendant] is liable to plaintiffs" and "certain facts must be assumed in this case."  The court, however, went too far when it told the jury "the reason[]" for those decisions: Defendant "willfully refused to comply with his discovery obligations," which "caused the plaintiffs prejudice, which means that it harmed their ability to prove their claims."

With those statements, the court added to the evidence.

## C.    The Error Was Not Harmless

*First*, the added evidence was irrelevant to the only trial-issue—damages.  A defendant's pretrial discovery failures do not tend to prove damages.

*Second*, the added evidence was unfairly prejudicial—indeed, inflammatory—describing Defendant's conduct as "willful" and "harm[ful,]" which the jury could easily have equated with the "evil intent" for punitive damages.

*Third*, a court should insulate a jury from prejudicial pretrial findings.  Here, however, the court did the very opposite.  It exposed the jury to the prejudicial reason *why* it made certain pretrial findings.  That information invited the jury to award damages not only for defamation and IIED, but also for "harm[]" "willfull[y]" "caused" by discovery failures.

*Fourth*, the added evidence unfairly prejudiced Defendant by raising the issue of character.

## D.    The Cumulative Effect Of Additional Errors Warrants Reversal

If the Rule 605 error, standing alone, does not warrant reversal, the Court should reverse based on the cumulative effect of that error and four others.

*First*, the court allowed the jury to watch the deposition of a *witness* who invoked the privilege against self-incrimination, and then to draw an adverse inference against *Defendant*.  Under Rule 401, however, courts allow this only

where the witness was employed by, or otherwise retained some loyalty to, the party.

Here, Plaintiffs offered no evidence establishing any such relationship, and the court failed to consider that factor. The court thereby abused its discretion.

Defendant, furthermore, suffered unfair prejudice: "The jury may think it high courtroom drama of probative significance when a witness 'takes the Fifth.' In reality," probative value "is almost entirely undercut by the absence of any requirement that the witness justify his fear of incrimination and by the fact that it is a form of evidence not subject to cross-examination." *Bowles v. United States*, 439 F.2d 536, 541-42 (D.C. Cir. 1970) (*en banc*).

Plaintiffs then exploited the drama. The court admitted approximately 50 fact-specific, leading questions to the witness, who invoked the privilege, but could not be cross-examined. For example:

> Q: Mr. Giuliani pointed to my clients for the sole purpose
> of helping to overturn the presidential election without
> any evidence that it was true, correct?
> A: I invoke the Fifth.

Plaintiffs thereby crafted, in essence, their own testimony in the guise of deposition questions, immune from cross-examination.

The district court compounded the prejudice, by giving an instruction that allowed the jury to draw whatever inference it wanted, including a forbidden inference—Defendant's guilt by association.

*Second*, the court instructed the jury that defamation "per se" is a "serious type of defamation[.]"  Plaintiffs' summation amplified that, arguing that it is the "worst kind of defamation."

The label "per se," however, has nothing to do with the seriousness of defamation.  It depends, rather, on whether the statement, *on its face,* injures reputation.  The jury had no need to hear the term "per se," much less to hear it with inflammatory gloss.

*Third*, Plaintiffs relied heavily on evidence and argument that Plaintiff's family suffered emotional distress.  A plaintiff, however, may not recover damages for injuries to another person.  The court nevertheless instructed the jury that compensable "harm may include harassment and threats to plaintiffs or their relatives[.]"

*Fourth*, the court erred when it instructed the jury that it may look outside the trial record, and "award an additional amount that, using your good judgment and common sense, you decide is necessary to fully compensate plaintiffs[.]"

Accordingly, the Court should reverse based on cumulative prejudice resulting from the foregoing errors, taken together.  The district court demonized Defendant before the jury.

## SUMMARY POINT V

## THE VERDICTS
## ARE EXCESSIVE

**A.    The Court Should Review These Issues**

The Court should review these issues, although not raised below.

**B.    The Compensatory Damages Are Excessive**

An excessive verdict is one which is beyond all reason, or so great as to shock the conscience.  The verdicts here meet that standard.  The verdicts, furthermore, appear to have been the product of passion, prejudice, mistake or other improper factors.

**C.    Common Law: The Punitive Damages Are Excessive**

Punitive damages should be enough to punish, but not to lead to bankruptcy. Here, however, the award led to Defendant's bankruptcy, filed days after the verdict.

The award, furthermore, dwarfs the amounts in prior cases. And, again, the award arose from consideration of improper factors.

**D.    Constitutional Law: The Punitive Damages Are Grossly Excessive**

The Due Process Clause protects against an award of "grossly excessive" punitive damages.  *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 562 (1996).  A court first examines whether the award serves a legitimate state interest, and then examines the "*Gore* guideposts."

### 1. Lack Of Legitimate State Interest

Punitive damages "must be supported by [a] State's interest in protecting its own consumers and its own economy." *Gore*, 517 U.S. at 573. A state does not "have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside" its jurisdiction. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003).

Applying these rules, the Court should reverse. D.C. cannot punish Defendant for tortious conduct in Georgia. Assuming that Defendant's conduct in D.C. injured Plaintiffs, they suffered injury in Georgia.

The award, finally, infringes on Georgia's policy-choices: D.C. imposed massive punitive damages to protect Georgians. Georgia's legislature, however, has capped punitive damages at $250,000.

### 2. The *Gore* Guideposts

#### a. Reprehensibility

Defendant's conduct was not reprehensible. Defendant engaged in pure speech, regarding a matter of legitimate public interest.

Defendant's audience engaged in reprehensible conduct, which Plaintiffs emphasized at trial. Accordingly, this case presents a high likelihood that the jury punished Defendant for the conduct of others, in violation of Defendant's due-process rights.

### b.      Disparity Between Compensatory
###          And Punitive Awards

This guideline requires examination of the ratio between compensatory and punitive damages.  An award more than four times compensatory damages might be close to the constitutional line.  A high compensatory award, however, may warrant a lower ratio.

Here, the ratio hovers around 4:1.  The compensatory awards, however, are high ($16,171,000 to $20,000,000), and likely include a component, emotional distress, duplicated in the punitive award.  These circumstances make even a 4:1 ratio too high.

The court, furthermore, incorrectly instructed the jury on this issue.  The court instructed: "Usually, a permissible punitive damages award will not be more than four times compensatory damages."  These instructions, however, lacked balance.  The instructions should have cautioned that a substantial compensatory award may warrant a lower ratio.  The instructions, moreover, effectively told the jury to return a verdict at a 4:1 ratio, which the jury did.

### c.      Sanctions For Comparable Misconduct

Under this guideline, a court accords substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.  Here:

In 1982, D.C. repealed its criminal-libel statute.  The jury awarded 300 times the maximum fine authorized by D.C. law in *any* criminal case; 6,000 times the

maximum fine for criminal conduct that causes emotional distress; and 300 times the Georgia statutory cap of $250,000.

## ARGUMENT

## POINT I

## THE AMENDED COMPLAINT
## FAILS TO STATE A CLAIM UPON
## WHICH RELIEF CAN BE GRANTED

The Amended Complaint asserts claims for defamation and for IIED, seeking to hold Defendant liable as a principal and as a coconspirator. For the following reasons, however, Plaintiffs' claims fail as a matter of law.

### A. Default Judgment: Legal Effects

A default judgment has two legal effects pertinent here. First, the defendant admits the facts alleged in the complaint. Second, "however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." 10A Wright & Miller, Federal Practice & Procedure ("WRIGHT & MILLER") §2688.1 (4th ed. 2024); *Henry v. Oluwole*, 108 F.4th 45, 55-57 (2d Cir. 2024).

Here, the district court entered a default judgment. Accordingly, Defendant admits the facts alleged in the Amended Complaint. The Court, however, must nevertheless decide whether those facts state a claim for defamation and/or IIED.

For the reasons set forth below, the answer to that question—a question of law—is no.

**B.     Standard Of Review**

This Court "has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp.*, 466 U.S. at 499 (cleaned-up). When making that examination, the Court "will reexamine the evidentiary basis on which" the lower court's conclusions "are founded[.]" *Id.* at 509-10 (cleaned-up).

**C.     The Amended Complaint Does Not Adequately Allege Defendant's Actual Malice**

**1.     Defamation: Essential Elements**

To plead defamation, a plaintiff must allege four essential elements: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement [here, constitutional/actual malice, defined below] amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (cleaned-up).

Here, the Amended Complaint does not adequately allege the third element—that Defendant published the statements at issue with constitutional/actual malice. Defendant, by operation of the default judgment, admits the falsity of the publications. He does not, however, admit the legal conclusion that he published with actual malice. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989) ("actual malice is a question of law[]").

### 2. Actual Malice: Applicable Law

The actual-malice standard is "famously daunting." *Couch v. Verizon Communications, Inc.*, 105 F.4th 425, 432 (D.C. Cir. 2024) (cleaned-up). A plaintiff must prove that the defendant published a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). To establish reckless disregard, the plaintiff must prove that the defendant published despite entertaining "serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The plaintiff, furthermore, must establish actual malice by clear and convincing evidence. *Couch*, 105 F.4th at 432.

### 3. Plaintiffs Did Not Clearly And Convincingly Establish Actual Malice

Here, the facts alleged in the Amended Complaint, and admitted by operation of the default judgment, do not adequately allege actual malice.

### a. Defendant Made A Rational
### Interpretation Of Ambiguous Information

As a matter of law, a plaintiff cannot establish actual malice where a speaker/publisher learns ambiguous information and adopts "one of a number of possible rational interpretations" of that information. *Bose Corp.*, 466 U.S. at 512-13 (no actual malice where author described, in words, his perceptions of music he heard); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 519 (1991) ("protection for rational interpretation serves First Amendment principles by allowing an author the interpretive license that is necessary when relying upon ambiguous sources[]"); *Moldea v. New York Times Co.*, 22 F.3d 310, 315-16 (D.C. Cir. 1994) ("some materials by their very nature require interpretation, and the First Amendment affords latitude to those engaged in that task[]").

Here, Defendant watched the Video, PTX-251, which served as his source of information. Defendant then played the Video for his audience. He narrated what he saw, pointing out an empty table where election observers would sit, pointing out a second table, noting election workers pulling containers out from under that second table, and wheeling those containers to an area where votes would be tabulated or counted, and noting that the few persons tabulating and counting were alone in the room.

Indisputably, the Video shows that the first of those tables was in fact empty, that election workers in fact pulled containers out from under the second table, and

25

then in fact wheeled those containers to an area where votes would be tabulated or counted. Defendant then made a rational interpretation of those things, which he had observed. He expressed that interpretation as his audience watched: "What you just saw is probably one of the most dramatic examples I've ever seen of someone trying to steal an election[.]" PTX-251at18:42-18:55.

Similarly, in later publications, Defendant made interpretations of what he saw: "[L]et's watch the democrats steal the election! And you can see it. . . . Every once in a while, you look closely, you can see them doing this[.] . . . [J]ust look at the tape." AC¶69. "During that videotape, that we can all see right in front of our eyes, we can see them stealing the votes. We can see them[.]" *Id*.¶71. "I can see the fraud, it's right in front of my eyes." *Id*.¶72. "They committed the crimes on video. You can see them do it." *Id*.¶90.

In sum, the visual information provided by the Video may have been ambiguous. Other observers may have interpreted the same information differently. Indeed, Georgia Secretary of State Raffensperger thought that Defendant "took it out of context." AC¶82.

At best for Plaintiffs, however, Defendant's interpretation "arguably reflect[s] a misconception[.]" *Time*, 401 U.S. at 290. Plaintiffs cannot "create a jury issue of '[actual] malice'" where, as here, Defendant adopted one of two (or more) possible rational interpretations of what he saw. *Id*.; *Plante v. Long*, 170

A.3d 243, 248-49 (Me. 2017) (parties participated in, and observed, same conduct/events; defendant stated that plaintiff's conduct "harass[ed]" defendant; the "events[,]" however, were "capable of misperception [by defendant] and thus not suitable to support any inference of actual malice[]"); *Freedom Newspapers of Texas v. Cantu*, 168 S.W.3d 847, 855-57 (Tex. 2005) (reporter watched debate; candidate made remarks about "bilingual and bicultural attributes[,]" which reporter described as "racial and ethnic[;]" held: "there is no factual dispute as to what" was said, and reporter made "rational interpretation" of what was said); *McMurray v. Howard Publications, Inc.*, 612 P.2d 14, 18 (Wyo. 1980) (no actual malice; publisher and plaintiff "disagreed with respect to their perceptions of events which they both observed.")

### b.     Plaintiffs' Allegations Do Not Establish Actual Malice

Plaintiffs' allegations do not change the conclusion that Defendant lacked actual malice.  Thus, according to the Amended Complaint:

On December 3, 2020, "Trump Campaign surrogates testified before the Georgia Senate."  At the hearing, "a lawyer assisting the Trump Campaign played snippets of the" Video, provided information regarding voting fraud, and identified Plaintiffs as participants in the misconduct.  Defendant then broadcasted the same information."  ¶¶37-39.

27

This allegation, however, cuts against Plaintiffs, and shows an absence of actual malice: Defendant merely repeated information disclosed by a campaign lawyer in official testimony, subject to penalties for false statement. *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1513-14 (D.C. Cir. 1996).

The next day, December 4, Georgia's "Voting Implementation Manager[,]" Gabriel Sterling, "refuted the false claims of election fraud[,]" ¶41, "shar[ing] a link to a [published] fact-check[,]" which in turn "quotes Georgia election officials[.]" ¶42. Later that day, Sterling, on television, "again explained why the video did not show any fraud[.]" ¶44. Defendant thereafter continued to publish.

These allegations, however, do not show actual malice. Defendant had no obligation to accept Sterling's denials of misconduct, "however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003) (cleaned-up). It does not "suffice for a plaintiff merely to proffer purportedly credible evidence that contradicts a publisher's story." *Jankovic v. Intl. Crisis Group*, 822 F.3d 576, 590 (D.C. Cir. 2016) (cleaned-up).

A fortiori, a publisher has no obligation to accept the denials of a *biased* source. *Lohrenz*, 350 F.3d at 1285 (publisher "could reasonably infer that [source] had not been objective in [reaching his] conclu[sions]"); *United States v. Abel*, 469

U.S. 45, 51 (1984) (bias "tend[s] to make the facts to which [witness] testified less probable").

Here, Sterling was biased. By December 4, the State of Georgia, through its Governor and its Secretary of State, had already "certified" the "election results[]" in favor of Biden. ¶35. Sterling, an employee of the State of Georgia, had an obvious motive to make statements that supported the prior institutional determination that election fraud had not occurred. Sterling naturally supported his superiors—and kept his job.[1]

In any event, leaving bias aside, Sterling's statements support the conclusion that Defendant made a rational interpretation of ambiguous information seen on the Video. Plaintiffs contend that Defendant published with actual malice when he stated that people were told to leave the State Farm Arena. Sterling, however, described this as "he said, she said[:]" Sterling admitted, "[Y]es, there w[ere] 82 minutes where there wasn't a person [a Republican monitor] there." ¶44. Sterling added that "the officials there said, 'We didn't tell anybody that they had to leave.' [But] [t]he people who left—the Republican monitor said, 'we were told we had to

---

[1] For similar reasons, neither the Affidavit of the State investigator, ¶¶47, the statements made at the Secretary's press conference, where Sterling repeated himself, ¶¶49-50, nor the statements posted on "a website maintained by the Secretary of State," ¶54, show actual malice. The Secretary and his subordinates were biased, motivated to uphold the earlier institutional decision that no fraud had occurred.

leave.'  And we have no audio from these videotapes to ascertain the absolute truth.  That's what is he said[,] she said[.]"  ¶44

A "he-said-she-said" dispute, by definition, presents facts that point, inconclusively, in two directions.  Plainly, a publisher's choice between two such factually-supported versions of "absolute truth" provides no evidence of actual malice.  *McFarlane*, 91 F.3d at 1513 (no actual malice; evidence gave publisher reasons to be skeptical and reasons to believe).

Next, Plaintiffs contend that Defendant published with actual malice when he stated that election workers took "suitcases" containing ballots from under a table.  Sterling, however, confirmed that as a factual matter.  ¶44.

Sterling, to be sure, characterized the containers as "regular absentee carriers[,]" not "suitcases."  ¶44.  The First Amendment, however, ignores such "immaterial" differences of characterization.  *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1300-01 (D.C. Cir. 1988).  In any event, even The New York Times used the word "suitcases."  PTX-293.

Plaintiffs contend that Defendant published with actual malice when he stated that election workers had scanned "the same ballots multiple times[.]"  ¶50.  This allegation, however, does not show actual malice.

Specifically, Plaintiffs rely on Sterling's answer to a question posed by a reporter, "Can you explain whether the machines can count a ballot three times?"

Tellingly, Sterling did not answer "no." Rather, he answered, in substance, "[Y]es, but." Specifically, Sterling said that multiple counting can occur but would be detected after the fact: "[I]f it . . . counted five times, guess what[,] it would have shown up in the hand count." ¶50.

This provides no evidence of actual malice. On the contrary, it confirms that Defendant saw what was—or what could rationally be interpreted as—multiple scanning or counting. AC¶66 (quoting Defendant describing contents of Video: "there are times in which *it appears* that they were being counted more than one time[]") (emphasis added).

Sterling concluded: "[T]he problem we have is people don't understand this[.]" ¶44. That, however, is precisely the point. Sterling's conclusion merely disputes Defendant's interpretation of what Defendant saw on the Video. "Misunderstandings" are not the stuff of which actual malice is made.

Plaintiffs next urge actual malice based on allegations that Defendant had a preconceived political mission. ¶129 (Defendant "decided in advance" to "benefit his preferred candidate, Donald Trump"); ¶132 (Defendant "hoped that his preconceived narrative" would "overturn[] the outcome of the presidential election.") Evidence that a publisher was "on a mission to advance a preconceived story line[,]" however, "does not suffice to show actual malice." *Lohrenz*, 350 F.3d at 1283-84. "The fact that a commentary is one-sided and sets forth

categorical accusations has no tendency to prove that the publisher believed it to be false." *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1307 (D.C. Cir. 1996) (cleaned-up).

Finally, the district court denied Defendant's motion to dismiss, relying, in part, on a document, entitled Strategic Plan, which stated, Plaintiff Freeman "now under arrest and providing evidence . . . on advanced coordinated effort to commit voter/election fraud [*need confirmation of arrest and evidence*]." ECF-31at21 (emphasis added); AC¶63. In so holding, however, the court erred. A publisher's self-disclosure of a gap in his knowledge "tends to rebut a claim of actual malice, not to establish one." *McFarlane*, 74 F.3d at 1304.

In sum, "the law certainly does not insist that [publishers] shut up as soon as they are challenged." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994). Here, Plaintiffs' allegations, viewed separately or cumulatively, *Jankovic*, 822 F.3d at 590, do not clearly and convincingly satisfy the daunting standard of actual malice. This Court should reverse.

**D.  The Amended Complaint Does Not Adequately Allege Liability On A Civil-Conspiracy Theory**

**1.  Conspiracy: Applicable Law**

"Civil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort." *Nader v. Democratic Nat. Committee*, 567 F.3d 692, 697 (D.C. Cir. 2009) (cleaned-up). To plead conspiracy,

a plaintiff must allege four essential elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) which overt act was done pursuant to an in furtherance of the common scheme." *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 671 (D.C. Cir. 2023) (cleaned-up).

Here, the Amended Complaint does not adequately allege the third element. To establish that element, the plaintiff must allege that a coconspirator committed the underlying tort—here, defamation.[2] The "conspiracy claim[,]" furthermore, "incorporates . . . every substantive element" of defamation, *Nader*, 567 F.3d at 697, including the elements that the coconspirator "published [a] statement without privilege[,]" *Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018) (cleaned-up), and with the requisite level of fault—here, actual malice. As demonstrated below, however, the Amended Complaint does not adequately allege those elements.

---

[2] *Iron Vine Security, LLC v. Cygnacom Solutions, Inc.*, 274 A.3d 328, 346 n.48 (D.C. 2022) (requiring "an unlawful overt act i.e. tortious conduct") (cleaned-up); Prosser, Torts ("PROSSER") §46 at 324 (5th ed. 1984) ("some act must be committed by one of the parties in pursuance of the agreement, which is itself a tort[]"); *Nader*, 567 F.3d at 697 ("civil conspiracy depends on performance of some underlying tortious act[]") (cleaned-up); *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983) (requiring "overt tortious act in furtherance of an agreement that causes injury").

### 2. The Amended Complaint Does Not Adequately Allege That A Coconspirator Committed Defamation

Two examples illustrate these flaws.

#### a. Trump-Raffensperger Phone Call

Plaintiffs seek to hold Defendant liable for statements made by then-President Trump—an alleged coconspirator—on a telephone call with Georgia Secretary Raffensperger.  AC¶¶85-86.  On that call, Trump made statements concerning Plaintiff Freeman, which, the Court may assume, were false.  For two reasons, however, Trump did not commit defamation.

*First*, the President has absolute immunity from civil liability for his official acts, *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982), and an absolute privilege in a defamation case.  *Barr v. Matteo*, 360 U.S. 564, 574 (1959).  The call with Raffensperger may constitute an official act.  *Trump v. United States*, 144 S. Ct. 2312, 2338-39 (2024).  Accordingly, this Court should remand, as in *Trump*.

*Second*, Plaintiffs' allegations do not clearly and convincingly establish that Trump spoke with actual malice.  Indeed, the Amended Complaint does not even allege that Trump spoke with actual malice, a failure that itself warrants reversal.

The Amended Complaint, furthermore, alleges that *Defendant* served as Trump's source of information, and that Trump merely "re-publish[ed]" statements

"made to [Trump] by Defendant[.]" ¶¶77-79.  As shown above, however, Defendant lacked actual malice.  Therefore, Trump lacked actual malice.

Finally, the law allowed Trump to publish information learned from a reliable source—such as his lawyer, Defendant, who owed his client a duty of honesty.  Restatement (Third), <u>Law Governing Lawyers</u> §16(3) and comment e (2000).  The Amended Complaint does not allege that Trump knew his lawyer to be "untrustworthy."  *Cannon v. Peck*, 36 F.4th 547, 571 (4th Cir. 2022).

### b.        Unidentified Coconspirators

The Amended Complaint alleges that Defendant conspired "with other individuals," ¶189, but does not identify those individuals.  Later, the district court entered a default judgment on liability, even though that judgment did not identify the coconspirators.  Later still, the court submitted the case to the jury on the theory that Defendant conspired with unidentified "members of the Trump 2020 presidential campaign[.]"  Dec.14a.m.Tr.143:22-144:6.

As demonstrated above, however, Defendant may have liability for acts of a coconspirator only if the coconspirator published with actual malice.  The state of mind required for actual malice, furthermore, must "be brought home to" the person who made the allegedly defamatory publication.  *N.Y. Times*, 376 U.S. at 287.  "When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual

responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." *Dongguk University v. Yale University*, 734 F.3d 113, 123 (2d Cir. 2013).

Here, Plaintiffs failed to identify any of the campaign members who published allegedly defamatory statements. Plaintiffs cannot possibly establish the state of mind of an unidentified person. *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 762 (4th Cir. 2023) (no actual malice; "record does not identify which staff members actually inserted [defamatory] language" into scripts).

## E. The IIED Claims Fail

A claim for IIED, like a claim for defamation, requires a plaintiff to establish actual malice. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988); *Couch*, 105 F.4th at 431. As shown above, however, Plaintiffs fail to establish actual malice. Therefore, Plaintiffs' IIED claims fail.

## F. Plaintiffs Cannot Recover For Both Defamation And IIED

"There is a great deal of overlap between the causes of action for defamation" and for other, related torts. *Moldea v. New York Times Co.*, 15 F.3d 1137, 1151 (D.C. Cir. 1994). Where the same publication provides the basis for both defamation and the other tort, the claim for the other tort merely duplicates the claim for defamation. The plaintiff may *plead* both claims in the alternative but may *recover* only for one. *Id*. (defamation/false-light); *Teltschik v. Williams &*

*Jensen, PLLC*, 748 F.3d 1285, 1288 (D.C. Cir. 2014) (defamation/negligence);

*Couch*, 105 F.4th at 436 (defamation/IIED), *aff'g*, 2021 WL 4476698, at *5

(D.D.C. Sept. 30, 2021).

Applying this rule, the Court should reverse. Plaintiffs based their two

claims on the same publications. Accordingly, they "may only recover on one of

the two theories[.]" *Moldea*, 15 F.3d at 1152. The jury, however, returned a

verdict on both theories, and the district court entered Judgment on the verdict.

The court thereby erred.

## G.     The Amended Complaint Does Not Adequately Allege "Extreme And Outrageous Conduct"

On a claim for IIED, "a plaintiff must show (1) extreme and outrageous

conduct on the part of the defendant[], which (2) intentionally or recklessly (3)

causes the plaintiff severe emotional distress." *Salem Media Group, Inc. v. Awan*,

301 A.3d 633, 656 (D.C. 2023) (cleaned-up). This case founders on the first

element, which presents a threshold question of law for the court. *Id*. at 657.

"Extreme and outrageous conduct is conduct[]"—*conduct*, not *speech*—

"that is so outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable

in a civilized community." *Id*. (cleaned-up). "[O]utrageous speech[,]" however,

"is protected by the Constitution," even though "outrageous conduct is not."

*Tompkins v. Cyr*, 995 F. Supp. 664, 682 (N.D. Tex. 1998).

Accordingly, a court "must be especially attentive to the potential chilling effect where the claim is based on pure speech relating to a matter of legitimate public interest[,]" even if "it is deeply upsetting to its subjects." *Salem*, 301 A.3d at 657-58 (cleaned-up). "Calling pure speech about an issue of public concern 'extreme and outrageous' is clearly reserved for the rarest of cases." *Id*.

This is not that rarest of cases. Defendant spoke regarding a matter of legitimate public interest—a Presidential election. Indeed, such speech "is the essence of self-government[,]" *Snyder*, 562 U.S. at 452, "occup[ying] the highest rung of the hierarchy of First Amendment values," and "entitled to special protection." *Id*. (cleaned-up).

This case, furthermore, exhibits none of the "hallmarks of extreme and outrageous conduct[,]" such as "abusing a position of authority over another," *Ortberg v. Goldman Sachs Group*, 64 A.3d 158, 164 (D.C. 2013), "callously disregarding another's known weakness," *id.*, "*numerous* unsolicited and unfriendly [home] visits[,]" *Homan v. Goyal*, 711 A.2d 812, 819 (D.C. 1998), "death threats[,]" *id*. at 817, or exploitation of a pre-existing relationship involving ill-will. *Snyder*, 562 U.S. at 455.

To be sure, in this case, third-persons who saw or read Defendant's statements—persons accurately characterized by Plaintiffs as "strangers," AC¶15—engaged in misconduct which, the Court may assume, crossed the border

into the realm of the extreme and outrageous. *See* AC¶155 (alleging

trespass/attempted home invasion, to make "citizens' arrest"), ¶151-53 (phone calls

filled with profanities, racial slurs and threat of lynching). Defendant, however,

has no liability for such misconduct by third-persons where, as here, Plaintiffs do

not allege that Defendant "coordinated" with those persons. *Salem*, 301 A.3d at

656 (cleaned-up).

**POINT II**

**PLAINTIFFS DID NOT
ESTABLISH PROXIMATE CAUSE**

The Judgment awarded compensatory damages, in favor of Plaintiff

Freeman ($16,171,000 for defamation; $20,000,000 for IIED), and in favor of

Plaintiff Moss ($16,998,000 for defamation; $20,000,000 for IIED). ECF-135. As

shown below, however, Plaintiffs did not adequately allege, or sufficiently prove,

that Defendants' publications proximately caused Plaintiffs' injuries. Accordingly,

the Judgment cannot stand. Review is *de novo*.

**A.     The Compensatory Awards Fall For Lack Of Proximate Cause**

**1.     Proximate Cause: Legal Effect Of Default Judgment**

Proximate cause has two components—one factual ("cause-in-fact") and one

legal (a "policy element [that] includes various liability[-]limiting considerations").

*Lacy v. District of Columbia*, 424 A.2d 317, 321 (D.C. 1980); *United States v.

Monzel*, 641 F.3d 528, 535-37 (D.C. Cir. 2011) (distinguishing "mere *fact* of

causation" from "singling out those [who] are to be held *legally* responsible[]")
(cleaned-up).

Here, by operation of the default judgment, Defendant admits cause-in-fact.
"[H]owever, it remains for the court to consider whether the unchallenged facts
constitute [proximate cause], since a party in default does not admit conclusions of
law." WRIGHT & MILLER §2688.1.

### 2. Proximate Cause: Intervening Criminal Acts

"D.C. follows the black-letter tort law principle that an intervening force
breaks the chain of proximate causation when that intervening force is sufficiently
unforeseeable as to constitute a superseding cause." *Hundley v. District of
Columbia*, 494 F.3d 1097, 1104 (D.C. Cir. 2007). "Where the intervening act is
criminal[,]" furthermore, "the defendant will be relieved of liability unless the
plaintiff can make a heightened showing of foreseeability, *i.e.*, that the criminal act
was so foreseeable that a duty arises to guard against it." *Freyberg v. DCO 2400
14th Street*, LLC, 304 A.3d 971, 977 (D.C. 2023) (cleaned-up).

The heightened-foreseeability rule "requires that the foreseeability of the
risk be more precisely shown." *Id*. at 977-78 (cleaned-up). "The bar for
establishing foreseeability" is "relatively high, because we want to limit the extent
to which defendants become the insurers of others' safety from criminal acts, and

we do not want to invite an absurd sprawl of liability whereby everyone is responsible for preventing all crimes at all times." *Id.* at 978 (cleaned-up).

### 3. The Amended Complaint Does Not Adequately Allege Proximate Cause

Here, as demonstrated below, the Amended Complaint does not adequately allege proximate cause.

The Amended Complaint repeatedly alleges acts—committed by third-persons—which intervened between Defendant's publications and Plaintiffs' injuries. The Amended Complaint alleges, for example, that "strangers" trespassed at the home of Plaintiff Freeman; trespassed at the home of Plaintiff Moss's grandmother, attempting to push into the house to make a "citizen's arrest[;]" and "bombarded" Plaintiff Moss and her son with telephone calls and "online harassment[,]" making racial slurs and threatening a lynching; ¶¶141-55.

Such acts, however, were criminal. Georgia Code §16-7-5 (home invasion); §16-4-1 (attempt); §16-11-39.1 (harassing communications). D.C. law, therefore, required Plaintiffs to allege heightened foreseeability, "i.e., that the criminal act was so foreseeable that a duty arises to guard against it." *Freyberg*, 304 A.3d at 977 (cleaned-up). The Amended Complaint, however, makes no such allegations.

To be sure, the Amended Complaint alleges that Sterling, the Georgia voting employee, stated, "Someone's going to get hurt, someone's going to get shot,

someone's going to get killed." AC¶138. That generic statement, however, does not suffice.

"The crux of heightened foreseeability is a showing of the defendant's increased awareness of the danger of a particular criminal act." *Freyberg*, 304 A.3d at 977 (cleaned-up). Liability requires a "reference to a precise location or class of persons." *Sigmund v. Starwood Urban Retail VI, LLC*, 617 F.3d 512, 515 (D.C. Cir. 2010) (cleaned-up). Sterling's statement, however, makes no reference to a particular criminal act, or to a precise location or class of persons. The Amended Complaint therefore lacks allegations that satisfy the heightened-foreseeability requirement.

### 4. The Trial Evidence Of Proximate Cause Was Insufficient To Sustain The Verdicts

In the alternative, the Court should reverse because the trial evidence provides "no legally sufficient evidentiary basis for a reasonable jury to find for [Plaintiffs] on [the] issue[]" of proximate cause. *Milone v. Washington M.A.T.A.*, 91 F.3d 229, 231 (D.C. Cir. 1996) (cleaned-up); Rule 50(a)(1).

As demonstrated above, this case involves intervening criminal acts. Plaintiffs, therefore, bore the burden of proving heightened foreseeability. The trial record, however, contains no evidence proving that issue.

To be sure, Plaintiffs, at trial, argued that Sterling's statement, quoted above, gave Defendant a "warning." Dec.14a.m.Tr.125:1-7. Sterling's statement,

however, is insufficient to sustain the verdicts.  Again, Sterling made no reference

to "a particular criminal act[,]" *Freyberg*, 304 A.3d at 977 (cleaned-up), or "to a

precise location or class of persons."  *Sigmund*, 617 F.3d at 515 (cleaned-up).  The

Court should therefore "reject[] liability as a matter of law[.]"  *Id.* (cleaned-up).

**B.     The Punitive Award Falls
         With The Compensatory Awards**

For the foregoing reasons, the Court should reverse the Judgment awarding

compensatory damages.  The Court should then reverse the Judgment awarding

punitive damages.  *Ayala v. Washington*, 679 A.2d 1057, 1069-70 (D.C. 1996)

(compensatory damages required "before punitive damages will be considered.")

**POINT III**

**PLAINTIFFS CANNOT
RECOVER PUNITIVE DAMAGES**

The district court entered Judgment on the verdict in the amount of

$75,000,000 for punitive damages.  ECF-142.  In doing so, however, the court

erred, for the following reasons.

**A.     Applicable Law: The Dual Malice Requirement**

"Something more than the mere commission of a tort is always required for

punitive damages."  PROSSER §2 at 9.  In an action for defamation and/or IIED, that

"something more" consists of two different kinds of malice—constitutional malice,

also known as "actual malice," and common-law malice.  Sack, Defamation

("SACK") §5:5.1[A] at 5-90-92 (2024).

Constitutional malice focuses on "the defendant's attitude toward the truth or falsity of the content of [his] publication." *Nader*, 408 A.2d at 40. Common-law malice, by contrast, "focus[es] on the defendant's attitude toward the plaintiff as the animus for defamatory publication[.]" *Id*.

To recover punitive damages, a plaintiff must establish both kinds of malice. 1 Standard Civil Jury Instructions ("STANDARD INSTRUCTIONS") §17.14 (2024). Here, however, as demonstrated in Point I(C)-(D) above, Plaintiffs have not established constitutional malice. Furthermore, as demonstrated below, Plaintiffs have not established common-law malice.

**B.    Applicable Law: Common-Law Malice**

A plaintiff seeking punitive damages must prove "that the [tortious] act was accompanied by conduct and a state of mind evincing malice or its equivalent." *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995). This kind of malice—common-law malice—requires proof that the defendant published with "spite[,] ill will" or the like. *Nader*, 408 A.2d at 40 ("bad or corrupt motive, spite, ill will, general hostility, intention to injure, or hatred[]"). This requirement applies to defamation; *id*.; *Columbia First Bank v. Ferguson*, 665 A.2d 650, 657-58 (D.C. 1995); and IIED; *Pitt v. District of Columbia*, 491 F.3d 494, 508 (D.C. Cir. 2007).

A plaintiff, finally, must prove common-law malice by clear and convincing evidence. *Breeden*, 665 A.2d at 938.

## C.    The Amended Complaint Does Not Adequately Allege Common-Law Malice

Here, as demonstrated below, the Amended Complaint does not adequately allege common-law malice.

Review is *de novo*.

The Amended Complaint does not allege that Defendant published with the requisite animus—spite, or ill-will, etc.—toward Plaintiffs. Rather, the Amended Complaint alleges that Defendant published "because he had decided in advance to disseminate a false narrative" that would "continue to benefit his preferred candidate, Donald Trump[;]" ¶129; and he "hoped that repeating his preconceived narrative would have the effect of overturning the outcome of the presidential election." ¶132. The Amended Complaint also alleges that Defendant published "because he believed [his storyline] to be personally advantageous" and "more profitable than reporting the truth[;]" ¶130; he published "in order to increase his profile and to profit[.]" ¶131.

Such allegations do not even address—much less satisfy—the elements of common-law malice. Accordingly, the Amended Complaint does not adequately allege common-law malice.

**D.     The Trial Evidence Of Common-Law Malice
        Was Insufficient To Sustain The Verdict**

In the alternative, the Court should reverse because the trial evidence

provides "no legally sufficient evidentiary basis for a reasonable jury to find for

[Plaintiffs] on [the] issue[]" of common-law malice.  *Milone*, 91 F.3d at 231.

The trial-record contains no evidence that Defendant published with the

requisite animus—spite, or ill will, etc.—toward Plaintiffs.  On the contrary, as

Plaintiff Moss testified, Defendant "didn't know me from a hole in the wall."

Dec.12p.m.Tr.49:21-22.  Therefore, the Court is "bound to remand."  *Afro-*

*American Pub. Co. v. Jaffe*, 366 F.2d 649, 661 (D.C. Cir. 1966) (*en banc*).

**E.     The District Court Failed To Instruct
        The Jury On Common-Law Malice**

In the further alternative, the Court should remand for a new trial.  As

demonstrated below, the district court failed to instruct the jury on common-law

malice.

Review is for plain error under Rule 51(d)(2).

On plain-error review, the defendant "bears the burden of showing: (1) that

there was an error, (2) that the error was clear or obvious, (3) that it affected his

substantial rights, and (4) that it seriously affected the fairness, integrity, or public

reputation of the judicial proceedings."  *United States v. Robertson*, 103 F.4th 1, 26

(D.C. Cir. 2023) (cleaned-up).

Here, Defendant has carried that burden:

*First*, the district court erred. "Deviation from a legal rule is 'error.'" *Olano v. United States*, 507 U.S. 725, 732-33 (1993). Here, a legal rule requires a court to give jury instructions, which, "viewed as a whole . . . fairly present the applicable legal principles and standards." *Czekalski v. LaHood*, 589 F.3d 449-53 (D.C. Cir. 2009) (cleaned-up). Here, the court deviated from that rule: The court did not instruct the jury on either the applicable substantive law of common-law malice (spite, ill-will, etc.) or the clear-and-convincing-evidence standard.

*Second*, the error was obvious: Applicable law is well-settled—so well-settled that it appears in "standard" jury instructions, overlooked here. STANDARD INSTRUCTIONS §17.14. This Court, furthermore, has traced the common-law malice requirement to the year 1851. *Afro-American Pub. Co.*, 366 F.2d at 661. And the D.C. Court of Appeals adopted the clear-and-convincing standard nearly 30 years ago. *Breeden*, 665 A.2d at 937.

*Third*, the error affected Defendant's substantial rights. On this issue, a court makes a "'harmless error' inquiry—to determine whether the error was prejudicial." *Olano*, 507 U.S. at 734. The defendant must "demonstrate[] a reasonable probability of a different outcome." *Molina-Martinez v. United States*, 578 U.S. 190, 200 (2016).

47

Here, the record demonstrates such a reasonable probability. The jury received insufficient guidance on the issue of punitive damages. The jury, left to its own devices, could only speculate on the law that governed its decision, whereupon the jury returned a massive verdict.

Correct instructions, however, would have focused the jury on the correct issue—Defendant's "attitude toward the plaintiff as the animus for" his speech, *Nader*, 408 A.2d at 40—an issue on which the evidence cut sharply against Plaintiffs. Dec.12p.m.Tr.49:21-22 (testimony: Defendant "didn't know me from a hole in the wall[]"). Accordingly, if the jury had received and followed correct instructions—including an instruction on the heightened, clear-and-convincing standard—the jury would have either rejected the claim for punitive damages, or returned a lower verdict. *Batka*, 704 F.2d at 690 ("incorrect instruction as to the evidentiary standard of proof is plain error[]") At the very least, Defendant has "demonstrated a reasonable probability of a different outcome." *Molina-Martinez*, 578 U.S. at 200.

 "It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations[.]"

*Anderson*, 477 U.S. at 254-55.  Accordingly, this Court,[3] and many others,[4] have reversed for plain error where, as here, a district court failed to instruct, or incorrectly instructed, the jury on (a) an essential element of a claim or a crime, (b) the state of mind required for liability, and/or (c) the applicable standard of proof.[5]

*Fourth*, the error here seriously affected the fairness, integrity, or public reputation of the judicial proceedings.  The jury imposed a "private fine[,]" *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001), without knowing—and therefore, necessarily, without applying—the law.  Such a verdict—unmoored to the law, and therefore lawless—is unfair and obviously undermines the integrity of judicial proceedings.  *Rasanen v. Doe*, 723 F.3d 325, 334-35 (2d Cir. 2013) ("error that deprives the jury of adequate legal guidance to reach a rational decision on a case's fundamental issue constitutes plain error[]") (cleaned-up); *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 123-24 (3d Cir. 1999) ("instructions failed to provide proper guidance for the jury on a fundamental question.  Moreover, our failure to consider the error would result in a

---

[3] *United States v. Rawlings*, 73 F.3d 1145, 1148-49 (D.C. Cir. 1996); *United States v. Alston*, 551 F.2d 315, 320-21 (D.C. Cir. 1976); *United States v. Wharton*, 433 F.2d 451, 456-61 (D.C. Cir. 1970); *Jackson v. United States*, 348 F.2d 772, 773-74 (D.C. Cir. 1965); *Byrd v. United States*, 342 F.2d 939, 941-42 (D.C. Cir. 1965).
[4] *Bearchild v. Cobban,* 947 F.3d 1130, 1139, 1145-49 (9th Cir. 2020); *Septimus v. University of Houston*, 399 F.3d 601, 608-09 (5th Cir. 2005); *United States v. Kline*, 922 F.2d 610, 612-13 (10th Cir. 1990); *United States v. Aitkin*, 755 F.2d 188, 193-94 (1st Cir. 1985).
[5] *MacEdward v. Northern Electric Co. Ltd.*, 595 F.2d 105, 109-10 (2d Cir. 1979).

miscarriage of justice[]"); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1018-19 (11th Cir. 2004) ("error of this magnitude resulted in a miscarriage of justice and seriously affected the fairness of the judicial proceedings[]").

"It is a basic premise of our jury system that the court states the law to the jury and that the jury applies that law to the facts as the jury finds them. Unless we proceed on th[at] basis[,]" the "jury system makes little sense." *Delli Paoli v. United States*, 352 U.S. 232, 242 (1957). Here, the district court did not proceed on that basis, and the system makes little sense. These circumstances seriously affect the public reputation of the judicial proceedings.

## POINT IV

### THE DISTRICT COURT
### ERRED WHEN IT ADDED
### TO THE TRIAL EVIDENCE

The district court informed the jury that "certain matters"—Defendant's liability—"have already been decided." The court, however, went further, telling the jury "the reason[]" for those pretrial decisions: Defendant "willfully refused to comply with his discovery obligations," which "caused the plaintiffs prejudice, which means that it harmed their ability to prove their claims." The court thereby added to the evidence, in violation of Rule 605.

Review is *de novo*; *see* Rule 605 ("[a] party need not object to preserve th[is] issue[]"); and for harmless error.

## A. Applicable Law

Under Rule 605, "[t]he presiding judge may not testify as a witness at the trial." The Rule applies to statements from the bench in the presence of the jury. *United States v. Blanchard*, 542 F.3d 1133, 1149 (7th Cir. 2008).

A "court violates Rule 605 when it adds to the record evidence." *Andasola*, 13 F.4th at 1016 (defendant testified "video had been altered[;]" court instructed jury "in fact, there was no other video[]") (cleaned-up); *United States v. Nickl*, 427 F.3d 1286, 1292-94 (10th Cir. 2007) (witness "gave conflicting testimony" about intent to defraud; court stated in jury's presence: "I would never have accepted her guilty plea unless she would have convinced me that's what she intended, and she did[]"); *United States v. Pritchett*, 699 F.2d 317, 319-20 (6th Cir. 1983) (testifying defendant denied knowledge that "Miles" had conviction; court gave "improper testimony[,]" stating, "[Miles] is the same one I sentenced, isn't he?")

This Court can also apply cases, many of which pre-date Rule 605, analyzing the common-law power to comment on evidence. Limitations on that power overlap with Rule 605: A judge "may analyze and dissect the evidence, but [s]he may not either distort it or add to it." *Quercia*, 289 U.S. at 470. Many

cases—in the Supreme Court,[6] this Court,[7] and other Circuits[8]—hold that a court

exceeds its common-law powers when the court adds to the evidence.

## B.     The District Court Erred

Here, the district court added to the evidence, and thereby erred.  At the

outset of trial, and again in final instructions, the court informed the jury:

> [I]n this case certain matters have already been decided. .
> . . *Before I give you instructions about what has already*
> *been decided, I will tell you the reason.*
> [P]arties are entitled to the disclosure of all relevant, non-
> privileged evidence in either party's possession or control
> during a process called discovery. . . .
> Since each party is entitled to obtain the other side's
> records, all parties to a lawsuit must preserve their
> records.  The federal rules require parties to preserve and

---

[6] *Glasser v. United States*, 315 U.S. 60, 82-83 (1942) (judge informed jury that witness had two prior indictments and pleaded guilty to one; "It is, of course, improper for a judge to assume the role of a witness[]").

[7] *United States v. Miller*, 738 F.3d 361, 393-98 (D.C. Cir. 2013) (court, responding to jury's questions, "instructed the jury on the specific phone calls that the grand jury intended to support specific offenses[,]" but instruction "was not proper because there was no evidence beyond the four corners of the superseding indictment of what that intent was[]"); *Blunt v. United States*, 244 F.2d 355, 362-365 (D.C. Cir. 1957) (defense expert/psychiatrist opined that defendant's acts were not planned; court "added to" evidence when court questioned witness, stating that acts "were planned," or "must have been planned[]").

[8] *United States v. Lopez-Soto*, 960 F.3d 1, 8-9 (1st Cir. 2020) (court instructed that witness had right to medical care, whether or not witness pleaded guilty; the "instruction thus added to the record evidence[]"); *United States v. Valentine*, 70 F. App'x 314, 324-25 (6th Cir. 2003) (court "err[ed;]" adding to trial testimony when court informed jury of information from witness' presentence report); *United States v. Paiva*, 892 F.2d 148, 158-59 (1st Cir. 1989) (court explained "field test" to jury; "[i]n adding his explanation of a field test to the evidence, the judge impermissibly exceeded the limitations on his power to comment[]").

produce the records so that there will be a level playing field . . . .

*In this case, the Court found that [Defendant] willfully refused to comply with his discovery obligations, including by failing to preserve all relevant records and failing to provide plaintiffs with all relevant records. . . . The Court has also found that [Defendant's] willful refusal to comply with his discovery obligations caused the plaintiffs prejudice, which means that it harmed their ability to prove their claims.*

To address the unfairness to the plaintiffs caused by [Defendant's] conduct . . . the Court has issued certain orders that [Defendant] is liable to plaintiffs on their [tort] claims. . . . Also[,] under these orders . . . you will be required to assume certain facts in calculating the amount, if any," of damages.

Tr.9:9-11:4 (emphasis added); Dec.14a.m.Tr.138:23-140:10.

Thus, the district court told the jury that certain matters had already been decided. The court also identified those matters for the jury. *Id.* ("[Defendant] is liable to plaintiffs" and "certain facts must be assumed in this case.") The court, however, went too far when it told the jury "the reason[]" for those decisions: Defendant "willfully refused to comply with his discovery obligations," which "caused the plaintiffs prejudice, which means that it harmed their ability to prove their claims."

Plainly, with those statements, the court added to the evidence. The jury learned those matters solely from the court, not from any witness or exhibit.

## C.  The Error Was Not Harmless

The error was not harmless under Rule 61 and/or 28 U.S.C. §2111: This Court cannot "say, with fair assurance, that the judgment was not substantially swayed by the error." *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1276 (D.C. Cir. 2010) (cleaned-up).

*First*, the added evidence was irrelevant to the only trial-issue—damages. Surely, at trial, a court would not admit evidence regarding a defendant's pretrial discovery failures, which has no tendency to prove a fact "of consequence in determining" damages.  Rule 401; *Jones v. Benefit Trust Life Ins. Co.*, 800 F.2d 1397, 1400 (5th Cir. 1986) (finding "no authority or rationale" for "proposition" that "pre-trial rulings may be relevant to an issue of fact before the jury.  Adopting [that] position would seem at odds with [Rule] 605[]"); *Nickl*, 427 F.3d at 1294 (error not harmless where judge's "commentary added new evidence which the prosecution was otherwise unable to establish.")

*Second*, the added evidence was unfairly prejudicial—indeed, inflammatory—describing Defendant's conduct as "willful" and "harm[ful]" to Plaintiffs.  The jury could easily have equated "willful[ness]" and "harm[fullness]" with the "evil intent" that can justify punitive damages.  *Daskalea v. District of Columbia*, 227 F.3d 433, 447 n.10 (D.C. Cir. 2000).  Plaintiffs' counsel, furthermore, made sure that the jury noticed, highlighting the discovery failures at

least three times in the opening and rebuttal summations.  Dec.14.Tr.54:22-55:4

("unfairness" to Plaintiffs); *id*. 64:2-22 (failure to "play[] by the rules"); *id*.

118:17-24 (failure to produce documents).

*Third*, a court should insulate a jury from prejudicial pretrial findings.  Thus,

for example, a court, before admitting coconspirator declarations, must find that a

conspiracy existed, that the defendant and the declarant were members, and that

the declarations were made during and in furtherance of the conspiracy.  *Bourjaily*

*v. United States*, 483 U.S. 171, 175 (1987); Rule 801(d)(2)(E).  "The judge[,]"

however, "should make" such "finding[s] outside the presence of the jury, and the

jury should not be told what facts the judge believes have been established."

*United States v. Tracy*, 12 F.3d 1186, 1200 (2d Cir. 1993).  In other words, to

avoid prejudice, the court does not explain *the reason why* the court admitted the

evidence.

Here, however, the district court exposed the jury to the prejudicial *reason*

*why* the court made certain pretrial findings.  That added evidence all but invited

the jury to award damages not only for defamation and IIED, but also for "harm[]"

"willfull[y]" "caused" by pretrial discovery failures, even though the court had

already remedied the prejudice by entering the default judgment.  *Quercia*, 289

U.S. at 470 ("[t]he influence of the trial judge on the jury is necessarily and

properly of great weight and h[er] lightest word or intimation is received with deference, and may prove controlling[]") (cleaned-up).

*Fourth*, the added evidence unfairly prejudiced Defendant by raising the issue of character, which "weigh[s] too much with the jury" and "so overpersuade[s] them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 476 (1948); *United States v. Wyatt,* 442 F.2d 858, 860-61 (D.C. Cir. 1971) (court "may have damaged [defendant's] credibility in the eyes of the jury[]"); *Godfrey v. United States*, 353 F.2d 456, 458 (D.C. Cir. 1965) (instructions suggested defendant was a "perjurer"); *Cunningham v. United States*, 311 F.2d 772, 772-73 (D.C. Cir. 1962) (court impugned "honest[y]"); *Pritchett*, 699 F.2d at 320 ("possibility" that "jury would take" judge's statement as "impeachment of [defendant's] credibility.")

## D.    The Cumulative Effect Of Additional Errors Warrants Reversal

Even if the Rule 605 error, standing alone, does not warrant reversal, the Court should reverse based on the cumulative effect of that error and four others, demonstrated below. *United States v. McGill*, 815 F.3d 846, 947 (D.C. Cir. 2016) ("total effect of numerous small missteps" may warrant reversal, "provided that appellant[] can demonstrate prejudice" from "errors taken together[]") (cleaned-up).

*First*, the court allowed the jury to watch the video deposition of a *witness*, Jenna Ellis, who invoked the privilege against self-incrimination, and then to draw an adverse inference against a *party,* Defendant.  Under Rule 401, however, a court, before admitting such evidence, considers several factors to assure that an "adverse inference is trustworthy under all of the circumstances[.]" *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997).  The factors include: (a) the nature of the relationship between the party and the witness, (b) the degree of the party's control over the witness, (c) whether the "witness is pragmatically a non[-]captioned party" so that the invocation of the privilege advances the interests of both party and witness, and (d) whether the witness "was a key figure" who "played a controlling role" in the litigation.  *Id*.

Courts applying these factors have admitted evidence that a *witness* invoked the privilege, and allowed an adverse inference against a *party*, only in limited circumstances—primarily, where the party employed the witness, *Cerro Gordo Charity v. Fireman's Fund American Life Ins. Co.*, 819 F.2d 1471, 1481-82 (8th Cir. 1987); or the witness otherwise "retained some loyalty" to the party.  *Coquina v. TD Bank, N.A.*, 760 F.3d 1300, 1311 (11th Cir. 2014) (party paid witness/former-employee's legal fees).

Here, Plaintiffs offered no evidence establishing those factors, as of the time of Ellis's testimony, and the district court did not even consider those factors.  The

court thereby abused its discretion. *Morrissey v. Mayorkas*, 17 F.4th 1150, 1156 (D.C. Cir. 2021) (court abuses discretion where decision "influenced by any mistake of law[]") (cleaned-up).

Defendant, furthermore, suffered unfair prejudice: The court subjected him to "the unnecessary spectacle of [a witness] invoking the Fifth Amendment in the jury's presence." *United States v. Uvino*, 590 F. Supp. 2d 372, 373 (E.D.N.Y. 2008) (Weinstein, J.). "The jury may think it high courtroom drama of probative significance when a witness 'takes the Fifth.' In reality, the probative value of the event is almost entirely undercut by the absence of any requirement that the witness justify his fear of incrimination and by the fact that it is a form of evidence not subject to cross-examination." *Bowles*, 439 F.2d at 541-42.

Plaintiffs then exploited the drama/spectacle. A court should not allow counsel to put fact-specific, leading questions to a witness who invokes the Fifth Amendment and who, therefore, cannot be cross-examined. That procedure yields both "a strong probability that [refusals to answer] will be taken as evidentiary[,]" *United States v. Maloney*, 262 F.2d 535, 537 (2d Cir. 1959) (Hand, J.), and a "danger" that invocations "will have disproportionate impact on [the] deliberations." *Bowles*, 439 F.2d at 541.

Here, however, the court and counsel did precisely that. The court received exhibits—filings in the Colorado Supreme Court—in which Ellis admitted that she

made misrepresentations in connection with the 2020 election. PTX-425,558. Her

admissions, however, made no mention of Defendant or of activities at State Farm

Arena.

Plaintiffs then transformed the evidence—making damaging statements in

leading questions, to which Ellis responded by invoking her privilege:

> Q: [Y]ou and Mr. Giuliani made false statements that
> were motivated by the desire to overturn the results of the
> 2020 presidential election, correct?
> A: I invoke the Fifth.
>
> Q: [I]t was part of Mr. Giuliani's strategy to use the State
> Farm Arena video in order to claim that there was fraud
> in the presidential election in Georgia, correct?
> A: I invoke the Fifth.
>
> Q: Mr. Giuliani pointed to my clients for the sole purpose
> of helping to overturn the presidential election without
> any evidence that it was true, correct?
> A: I invoke the Fifth.

PTX-594. Counsel, notably, asked approximately 50 additional, similar questions.[9]

The questions had an obvious purpose—to suggest that the answers would

be "yes." Defendant thereby "suffer[ed] unfair prejudice[;]" Plaintiffs crafted, "in

essence, their own testimony in the guise of deposition questions[,]" *In re*

*Urethane Antitrust Litigation*, 2013 WL 100250, at *4 (D. Kan. Jan. 8, 2013),

immune from cross-examination. "Although [counsel's] statement[s], and [Ellis's]

---

[9] The parties also stipulated that Ellis invoked the privilege 448 times, and that
another deposition witness, Ray Smith, invoked the privilege 309 times. PTX-588.

refusals to answer, were not technically testimony, [counsel's statements] may well have been the equivalent in the jury's mind[.]" *Douglas v. Alabama*, 380 U.S. 415, 419 (1965).

The district court then compounded the prejudice. The court committed plain error when it failed to instruct the jurors "that they must not use the refusal as evidence of what the answer would have been." *Maloney*, 262 F.2d at 538; *Bowles*, 439 F.2d at 541 (jury "not entitled to draw any inferences from" invocation). Instead, the court instructed: "You may infer from [a] refusal [to answer] that the witness's answers would have been adverse to her interest, but you are not required to make such an inference and may choose, instead, to disregard the evidence of the assertion of the Fifth Amendment. You should consider any inference you may or may not choose to draw from any such refusal to testify together with all the other evidence in the case." Dec.14a.m.Tr.132:13-23.

Those instructions, however, allowed the jury to draw whatever inference it wanted, including a forbidden inference—Defendant's guilt by association. "The revelation that [the witness] has claimed the privilege marks him as a criminal who has probably eluded justice." *Hinojosa v. Butler*, 547 F.3d 285, 294 (5th Cir. 2008) (cleaned-up).

*Second*, the district court instructed the jury, in both preliminary instructions and final instructions, that defamation "per se" is a "serious type of defamation[.]" Dec.11p.m.13:6; Dec.14p.m.142:13-14. Plaintiffs' summation amplified that instruction, arguing that defamation "per se" is the "worst kind of defamation." Dec.14a.m.Tr.59:24-25. Court and counsel thereby misstated the law.

The label "per se" has nothing to do with the seriousness of defamation. That label, rather, depends on "whether the statement is injurious to reputation *on its face*." SACK §2.8:1. If "defamatory meaning is apparent from the statement itself[,]" then "it is libel per se[,]" and "the communication will support a cause of action for defamation without proof of special damages (actual pecuniary loss)." *Id.* The jury had no need even to hear the term "per se," much less to hear it with inflammatory gloss.

*Third*, Plaintiffs relied heavily on evidence and argument that Plaintiff Moss's grandmother and teenage son suffered emotional distress. Dec.12a.m.Tr.68-78. Indeed, Plaintiff Moss testified, "I want to receive some type of justice for everything that me and my family has been through." Dec.12p.m.Tr.40:10-12.

A plaintiff, however, may not recover damages for injuries to another person. PROSSER §1 (tort law's "purpose" is "to afford compensation for injuries sustained by one person as the result of the conduct of another[]"). The court

nevertheless instructed the jury that compensable "harm may include harassment and threats to plaintiffs or their relatives[.]"  Dec.14a.m.Tr.146:4-5.

*Fourth*, the court erred when it instructed the jury that it may look outside the trial record: "[I]f you decide that the evidence does not fully capture the harm that [P]laintiffs suffered as a result of the damage to their reputations, you may award an additional amount that, using your good judgment and common sense, you decide is necessary to fully compensate plaintiffs[.]"  Dec.14.Tr.148:25-149:5. A jury, however, must decide a case solely upon the trial-evidence, as the leading authority states—in nine contexts.  4 Sand, Modern Federal Jury Instructions— Civil ¶¶71.01-.02 (2024) (Instructions 71-4-5;71-7;71-9-10;71-12-15).

Accordingly, the Court should reverse based on cumulative prejudice resulting from the foregoing errors, taken together.  The district court demonized Defendant—a "willful" violator who associated with criminals, committed the "most serious" or "worst kind" of defamation, "harmed" Plaintiffs again within the discovery process, and then harmed Plaintiffs' relatives.  The court, for good measure, licensed the jury to "award an additional amount" if "the evidence does not fully capture the harm[.]"  This record amply demonstrates "a significant chance" that the errors "influenced the outcome of the case."  *Standley v. Edmonds-Leach*, 783 F.3d 1276, 1285 (D.C. Cir. 2015).

## POINT V

## THE VERDICTS
## ARE EXCESSIVE

### A.     The Court Should Review These Issues

The Court, for the following reasons, should review these issues, although not raised in the district court.

*First*, "precedent generally favors more searching appellate review of punitive damages" to "ensure awards[] comport with the Constitution." *Owens v. Republic of Sudan*, 864 F.3d 751, 813 (D.C. Cir. 2017), *vacated on other grounds*, 590 U.S. 418 (2020). These concerns call for "a similarly exacting standard for review of an untimely challenge to an award[,]" *id.*, "[g]iven the size of the award[]" and "the strength of [Defendant's] contentions[.]" *Id.* at 814; *Cooper Indus., Inc.*, 532 U.S. at 436 (citing need "to maintain control" of the "legal principles[]") (cleaned-up).

*Second*, this case presents "novel question[s] of constitutional law[,]" *Owens*, 864 F.3d at 813: Can the District of Columbia punish Defendant for tortious conduct that injured Georgians in Georgia? Can D.C. impose its policy-choices on Georgia by awarding $75,000,000 to Georgians, even though Georgia has made different policy-choices—a statutory cap of $250,000? Can pure speech, regarding a matter of legitimate public interest, constitute "reprehensible" conduct for punitive-damages purposes?

*Third*, the excessiveness of the compensatory-damages award presents "an issue antecedent to[,] and ultimately dispositive of[,] the [damages] dispute[.]" *Lesesne v. Doe*, 712 F.3d 584, 588 (D.C. Cir. 2013) (cleaned-up). Review may therefore avoid a constitutional-law question.

*Fourth*, these issues present "pure questions of law" that "need no further factual development." *Owens*, 864 F.3d at 814.

## B. The Compensatory Damages Are Excessive

"An excessive verdict is one which is beyond all reason," or "so great as to shock the conscience." *Scott v. Crestar Financial Corp.*, 928 A.2d 680, 688 (D.C. 2007) (citation omitted). The awards here meet that standard; they dwarf the amounts reviewed in prior appeals.[10]

"Excessiveness refers not only to the amount of the verdict but to whether," under all the circumstances, the award "appears to have been the product of passion, prejudice, mistake or consideration of improper factors rather than a

---

[10] The parentheticals state the amount of the award and that amount adjusted for inflation, using https://www.bls.gov/data/inflation_calculator.htm. *District of Columbia v. Bamidele*, 103 A.3d 516, 521-22 (D.C. 2014) ($60,000/$80,680 and 10,000/13,446); *Campbell-Crane & Assoc., Inc. v. Stamenkovic*, 44 A.3d 924, 944-46 (D.C. 2012) ($800,000/$1,110,149); *District of Columbia v. Tulin*, 994 A.2d 788, 803 (D.C. 2010) ($450,000/$640,499); *Crestar*, 928 A.2d at 687-88 (vacating $1,000,000/$1,523,679); *Daskalea*, 227 F.3d at 443-44 ($350,000/$639,490); *Homan*, 711 A.2d at 821 ($40,000/$76,341); *Robinson v. Sarisky*, 535 A.2d 901, 905-06 (D.C. 1988) ($4,000/$10,663); *see Funari v. MD Dep't of Public Safety & Correctional Services*, 2024 WL 2749694, at *4-5 (D. Md. May 29, 2024) (vacating $2,750,000).

measured assessment of the degree of injury suffered by the plaintiff." *Id.* Here, the Court should readily conclude that such factors produced the verdicts. As demonstrated in Point IV above, the district court demonized Defendant before the jury.

**C.      Common Law: The Punitive Damages Are Excessive**

"[T]he purpose of punitive damages is to punish a tortfeasor and deter future conduct[.]" *Breeden*, 665 A.2d at 941. Therefore, "the amount of such damages should be enough to inflict punishment, while not so great as to exceed the boundaries of punishment and lead to bankruptcy." *Id. Cf.* 18 U.S.C. §3553(a) ("court shall impose a sentence sufficient, but not greater than necessary[]").

Here, indisputably, the amount was so great as to lead to bankruptcy: Defendant filed for bankruptcy within days of the verdict. *Veg-Mix, Inc. v. Dep't of Agriculture*, 832 F.2d 601, 607 (D.C. Cir. 1987) (judicial notice; "bankruptcy pleadings[]").

In any event, again, the award here dwarfs the amounts reviewed in prior appeals.[11] And, again, the award arose from consideration of improper factors.

---

[11] *Bamidele*, 103 A.3d at 522-24 ($330,000/$435,103); *Howard University v. Wilkins*, 22 A.3d 774, 782-85 (D.C. 2011) ($42,667.50/$59,755); *Modern Management Co. v. Wilson*, 997 A.2d 37, 53-61 (D.C. 2010) ($3,300,000/$4,696,987); *Daka, Inc. v. McCrae*, 839 A.2d 682, 699-700 (D.C. 2003) (vacating $4,812,500/$8,168,722); *Daka, Inc. v. Breiner*, 711 A.2d 86, 100-02 (D.C. 1998) ($390,000/$744,323); *see Harvey-Jones v. Coronel*, 196 A.3d 36, 46 (Md. App. 2018) ($200,000/$248,857; reviewing 60-year period).

Indeed, the Court should "infer passion, prejudice, or partiality from the size of the award." *Honda Motor Co. v. Oberg*, 512 U.S. 415, 425 (1994).

**D.     Constitutional Law: The Punitive Damages Are Grossly Excessive**

The Due Process Clause protects a tortfeasor against an award of "grossly excessive" punitive damages. *Gore*, 517 U.S. at 562. The "excessiveness inquiry appropriately begins with an identification of the state interests that a punitive damages award is designed to serve[,]" focusing "on the scope of [the state's] legitimate interests in punishing [the tortfeasor] and deterring [him] from future misconduct." *Id.* at 568.

Next, assuming a legitimate state interest, the court examines "[t]hree guideposts[;]" [1] "the degree of reprehensibility of the [tortfeasor's conduct]; [2] the disparity between that harm or potential harm suffered by [the plaintiff] and [the] punitive damages award; and [3] the difference between this remedy and the civil [or criminal] penalties authorized or imposed in comparable cases." *Id.* at 574-75, 583.

Here, treating the District of Columbia as a state,[12] and applying the Fifth

Amendment rather than the Fourteenth,[13] the Court should reverse, for the reasons

set forth below.

Review is *de novo*. *Cooper Indus., Inc.*, 532 U.S. at 431.

### 1. The Court Should Reverse For Lack Of Legitimate State Interest

Punitive damages "must be supported by [a] State's interest in protecting its

own consumers and its own economy." *Gore*, 517 U.S. at 573 ("its residents"); *id.*

at 585 ("its citizens"). A state does not "have a legitimate concern in imposing

punitive damages to punish a defendant for unlawful acts committed outside of the

State's jurisdiction." *State Farm*, 538 U.S. at 421. A state, furthermore, cannot

impose punitive damages "to punish a defendant for injury that [he] inflicts on

nonparties." *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007).

Applying these rules, the Court should reverse. D.C. cannot punish

Defendant for tortious conduct in Georgia. The Court may assume that

---

[12] This Court, without statutory compulsion, applies the *Erie* doctrine, *Halberstam*, 705 F.2d at 479 n.10, under which the Court, "adjudicating a state-created [or locally-created] right" sits as "only another court of the State," *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 108 (1945), or here, of the District. Congress, furthermore, exercising "powers that the legislature of a state might exercise within the State," *Palmore v. United States*, 411 U.S. 389, 397 (1973) (cleaned-up), has established "strictly local courts" created "to exercise the powers of" a "state government[.]" *Id.* at 407 (cleaned-up).
[13] *Modern Management*, 997 A.2d at 45 n.11.

Defendant's conduct in D.C. inflicted injury on Plaintiffs. They suffered that injury, however, in Georgia, not in D.C. *White v. Ford Motor Co.*, 312 F.3d 998, 1020 (9th Cir. 2002) (Nevada cannot "impos[e] punitive damages to protect people or punish harm outside of Nevada[]"); *Estate of Schwartz v. Philip Morris Inc.*, 135 P.3d 409, 430 (Or. App. 2006) (state may not punish "for harm that is caused and occurs outside its jurisdiction[]"); *Ford Motor Co. v. Ammerman*, 705 N.E.2d 539, 561 (Ind. App. 1999) (limiting award "to protecting [Indiana's] consumers[]").

Plaintiffs here went forum-shopping, seeking (presumably) a "better" (anti-Trump) venire. Plaintiffs reaped the benefits of that choice but must also shoulder the burdens: D.C. cannot punish Defendant for conduct (inside or outside D.C.) that injured Plaintiffs in Georgia. Here, D.C. did not "protect[] its own[.]" *Gore*, 517 U.S. at 572.

The award, finally, impermissibly "infring[es] on the policy choices of [an]other State[.]" *Gore*, 517 U.S. at 572. D.C. has imposed massive punitive damages to protect Georgians. Georgia, however, "has quite a different policy on punishment by means of punitive damages: its legislature imposed a ceiling," *White*, 312 F.3d at 1017, of $250,000. Georgia Code §51-12-5.1(g). *Gore* prohibits D.C. from "impos[ing] its policy on" Georgia. *White*, 312 F.3d at 1018.

## 2. The Court Should Reverse On Examination Of The *Gore* Guideposts

### a. Degree Of Reprehensibility

Here, the first, and most important, *Gore* guidepost, the degree of reprehensibility of the defendant's conduct, points toward reversal. Defendant's conduct was not at all reprehensible. Defendant engaged in pure speech, regarding a matter of legitimate public interest. *See* Point I(G) above. Such speech, even if tortious, does not rise to the high level of reprehensibility required to sustain the enormous punitive-damages award here.

To be sure, Defendant's audience engaged in reprehensible conduct, *see* Point I(G), which Plaintiffs emphasized at trial. Accordingly, this case presents a high likelihood that the jury punished Defendant for the conduct of others. Due process, however, does not permit a court to impose punitive damages against Defendant for the acts of others—any more than it would permit a court to imprison Defendant for crimes committed by others, absent proof of conspiracy or aiding and abetting, which does not exist here.

Cases involving speech pose an additional risk: Punitive damages "are punishment of expression [and] therefore a device peculiarly suited to use by judges and juries to avenge offending communications or to silence unpopular speakers." SACK §10:3.5 at 10-16. "In a case such as this, a jury is unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming

an instrument for the suppression of vehement, caustic, and sometimes unpleasant expression." *Snyder*, 562 U.S. at 458 (cleaned-up). "Such a risk is unacceptable[.]" *Id.*

### b. Disparity Between The Compensatory And The Punitive Awards

This guideline requires a court to examine the ratio between the amount of compensatory damages and the amount of punitive damages. "[F]ew awards exceeding a single-digit ratio" will satisfy due process. *State Farm*, 538 U.S. at 425. Indeed, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* A high compensatory award, however, may warrant a lower ratio. *Id.*

Here, for each category of damages, the ratio hovers around 4:1. The compensatory awards, however, are high, ranging from $16,171,000 to $20,000,000, and "likely" include "a component[,]" emotional distress, "duplicated in the punitive award." *Id.* at 426. These circumstances make even a 4:1 ratio too high. *Id.* at 419 ("It should be presumed a plaintiff has been made whole" by compensatory damages); *Lompe v. Sunridge Partners*, *LLC*, 818 F.3d 1041, 1068-73 (10th Cir. 2016) ("many" courts impose "1:1 ratio" where compensatory damages exceed $1,000,000, "often" considered a "substantial[]" amount).

The district court, moreover, erred in that it gave the jury incomplete—and therefore, imbalanced—instructions on this issue. The court instructed:

> Although you should use your discretion to choose an appropriate amount of punitive damages, the law still requires that the amount be reasonable in proportion to the amount of compensatory damages that a plaintiff has suffered. Punitive damages that are more than ten times compensatory damages are almost never permissible. Usually, a permissible punitive damages award will not be more than four times compensatory damages.

Dec.14a.m.Tr.156:8-15.

These instructions, however, failed to provide balance. The instructions should have cautioned the jury that a substantial compensatory award—which the jury here certainly made—may warrant a lower ratio. *State Farm*, 538 U.S. at 425. The instructions, as given, effectively told the jury to return a verdict at a 4:1 ratio, which the jury duly did. *United States v. Rhone*, 864 F.2d 832, 837 (D.C. Cir. 1989) (jury "likely to discern hints, a point of view, a suggested direction, even if none is intended and quite without regard to the judge's efforts to modulate and minimize [her] role[]"); *Dowell, Inc. v. Jowers*, 166 F.2d 214, 221 (5th Cir. 1948) (plain error; charge referred to "sum suggestive" of "proper award.")

c.      **Sanctions Authorized For Comparable Misconduct**

Under this guideline, a court compares the award to "the civil or criminal penalties that could be imposed for comparable misconduct[.]" *Gore*, 517 U.S. at 583. This guideline "accord[s] substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id*. (cleaned-up).

Here, examination of this guideline shows—overwhelmingly—that the $75,000,000 award is grossly excessive.

*First*, in 1982, the D.C. City Council made a clear legislative judgment, repealing the criminal-libel statute. Defamation is not a crime.

*Second*, under D.C. Code §22-3571.01(b)(12), the maximum fine authorized in *any* criminal case is $250,000—and then, only "if the offense resulted in death." Here, the jury awarded 300 times that amount—even though no death resulted. *Gordon v. Rice*, 261 A.3d 224, 231 (D.C. 2021) (examining Code fines).

*Third*, D.C. Code §§22-3132(8)(A) and 3133 criminalize a course of conduct that causes another to suffer emotional distress. The maximum fine authorized for that offense is $12,500. §§22-3134(b)(4); 22-3571.01(b)(6). Here, the jury awarded 6,000 times that amount. *Cf. N.Y. Times*, 376 U.S. at 278 (judgment 1,000 times greater than criminal-libel fine).

*Fourth*, the Court should consider the legislative judgment made by the State of Georgia—Plaintiffs' domicile—which caps an award at $250,000 (subject to an exception, for a case of "specific intent to cause harm," §51-12- 5.1(f), which would not apply). Here, Plaintiffs forum-shopped their way into an award 300 times their home-state cap.

# CONCLUSION

The Court should reverse the Judgment and either dismiss this action or remand for further proceedings.

Dated:  October 2, 2024
        New York, N.Y.

KENNETH CARUSO LAW LLC

By:  /s/ Kenneth A. Caruso
Kenneth A. Caruso
15 W. 72nd Street
New York, NY 10023
(646) 599-4790
ken.caruso@kennethcarusolaw.com

LABKOWSKI LAW, P.A.

By:  /s/ David Labkowski
David Labkowski
250 95th Street, Unit #547233
Surfside, Florida 33154
(786) 461-1340
david@labkowskilaw.com

*Attorneys for Defendant-Appellant,*
*Rudolph W. Giuliani*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains <u>14,969</u> words, as allowed by the recent Court Order and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using MS Word 2016 in <u>Times New Roman 14-point font</u>.

Dated: October 2, 2024
      New York, N.Y.

KENNETH CARUSO LAW LLC

By: <u>/s/ Kenneth A. Caruso</u>
Kenneth A. Caruso
15 W. 72nd Street
New York, NY 10023
(646) 599-4790
ken.caruso@kennethcarusolaw.com

LABKOWSKI LAW, P.A.

By: <u>/s/ David Labkowski</u>
David Labkowski
250 95th Street, Unit #547233
Surfside, Florida 33154
(786) 461-1340
david@labkowskilaw.com

*Attorneys for Defendant-Appellant,*
*Rudolph W. Giuliani*